**John W. MILTON, Plaintiff,**

v.

**BELL LABORATORIES, INCORPORATED, Defendant.**

**Civ. No. 75–956.**

United States District Court, D. New Jersey.

March 7, 1977.

University of Rutgers Litigation Clinic, Newark, N.J., by Annamay T. Sheppard, West Orange, N.J., for plaintiff.

Carpenter, Bennett & Morrissey by Thomas L. Morrissey, Newark, N.J., for defendant.

## MEMORANDUM OPINION

LACEY, District Judge.

Plaintiff, a 38-year-old black attorney, sues under 42 U.S.C. § 1981 (1974), the thirteenth amendment of the United States Constitution, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (1974), alleging racial discrimination practiced by the defendant corporation Bell Laboratories, Incorporated [BTL], in refusing to employ him in its Patent Division. He seeks declaratory and injunctive relief together with compensatory and punitive damages, counsel fees and costs of suit. Subject matter jurisdiction lies in this court under 28 U.S.C. §§ 1331 (1966), as amended by Pub.L. 94–574, 90 Stat. 2721 (1976), and 1343(3) (1976) and 42 U.S.C. § 2000e–5(f)(3) (1974).

The defendant BTL is a New York corporation jointly owned by The American Telephone and Telegraph [AT&T] and Western Electric Company, Incorporated [Western Electric]. Its primary function is to provide research and development services in communications technology to AT&T and West-

ern Electric. P–36.[1] BTL does not deny refusing plaintiff employment. It contends, however, that it did so not because of racial reasons but because he was found not to have the ability it sought and required in applicants for employment in its Patent Division.

BTL's Patent Division is within its Research and Patent Area, which encompasses divisions responsible for physical research, mathematics, behavioral sciences, communications sciences, and operations research. P–36.

Plaintiff is a black male citizen of the United States. At the date of the filing of his original complaint, he was a resident of the State of New Jersey. He is presently a resident of the State of Maryland. Tr. 6.[2]

He holds an Associate Degree from the R.C.A. Institute (1964), P–1 and Stip. 1,[3] and a Bachelor of Science degree with a major in computer technology and computer science from New York Institute of Technology (1972). P–3; Stip. 1. As an undergraduate he had 73 hours of study in electronics technology, mathematics and physics. P–1; P–3; Tr. 107, 118. He received a Juris Doctor degree from Rutgers Law School in June 1975, Stip. 5; and he is a member of the bar of the State of Pennsylvania. Stip. 6; Tr. 8. Between his graduation from the R.C.A. Institute and matriculation at New York Institute of Technology, he had five years of employment in the computer technology field. Tr. 100–05.

From October 1975 to September 1976 he was employed in a legal capacity in the Patent Section of the United States Energy Research and Development Administration [ERDA]. Tr. 72, 88. His compensation there was $14,500 per annum. Tr. 94. He is presently employed as an attorney by the United States Equal Employment Opportunity Commission in Washington, D.C. Tr. 9. His compensation is about $20,400 per

year. Tr. 99. In view of his employment almost immediately after law school, his damages are minimal. However, he seeks punitive damages of $1,000 and counsel fees.

At the time when plaintiff was a student at New York Institute of Technology, that institution had a permanent charter from the New York State Board of Regents as a four-year college granting the baccalaureate degree. Stip. 2; Tr. 9.

While a student at New York Institute of Technology, plaintiff had a cumulative grade point average of 3.03 on a 4.00 scale. Stip. 3. Additionally, he received a citation for distinctive student achievement throughout his college years; the Richard Gabey Memorial Award; and a Woodrow Wilson National Foundation two-year Martin Luther King Fellowship to attend graduate or professional school for the academic years 1972–1973 and 1973–1974, Stip. 4 as amended at Tr. 11, as well as other honors and credentials reflected in P–7; Tr. 10–11.

Plaintiff's contact with BTL began shortly before his graduation from New York Institute of Technology, when he was interviewed there by a BTL recruiter. Tr. 17, 38.

He was offered but refused a position with the defendant, at a starting salary of $12,000 per year. Stip. 7; Tr. 129.

Later, he applied for temporary employment with the defendant in the summer of 1973, but none was available. However, with defendant's assistance, he secured a summer job with the Urban League of Union County, New Jersey, where his salary of $245 a week was provided to the Urban League by the defendant. Stip. 8; Tr. 40, 130.

The following year, January 23, 1974, plaintiff applied to defendant for summer employment. P–6; P–7. He was offered

---

**1.** References herein to the exhibits of each party in evidence are designated "P–____" or "D–____."

**2.** References herein to the pages of the trial transcript are designated "Tr. ____."

**3.** References herein to the paragraphs of the Stipulation of Facts filed herein are designated "Stip. ____."

employment and accepted it by letter of February 28, 1974, P–8, at a salary of $250 per week. He became one of a group of five Patent Division participants in the BTL 1974 summer training program for minorities and women. Stip. 9. This was a program, initiated in October 1973, and undertaken by the Patent Division to interest and encourage minorities and women in careers as patent attorneys and to increase the pool of potential minority and female applicants. The program provides minorities and women with temporary summer employment and exposes them to the actual work experience of patent attorneys and the career potentials of patent law. Jt.Ex. 36–37, 61–62; P–33.[4] Plaintiff reported for work on June 4, 1974 and terminated his employment on September 15, 1974. Stip. 10; P–86.

William Ryan, BTL patent attorney and coordinator, and recruiter for the Patent Division 1974 Summer Program, included plaintiff in the program because he was mature, had a varied experience, had a degree in a nominally technical discipline, was already in law school, and had indicated an interest in patent law. Jt.Ex. 44. It was merely a familiarizing program. Tr. 774. There was no commitment of any participant to make patent law his or her career, and there was no suggestion made to him or her by BTL of permanent employment. Tr. 133, 1026.

Plaintiff was assigned to work under the supervision and guidance of Charles Graves, a Patent Division "host" or "associated attorney." Tr. 137. Plaintiff, apparently in an effort to advance his "central allegation" of inadequate supervision, Tr. 57, points to the fact that during the summer of 1974 Mr. Graves was absent from plaintiff's worksite for 23 full working days and four partial days during plaintiff's three months and two weeks employment. D–52. It is noted too that plaintiff's expert witness, Laurence Lerner, indicated Graves' supervision of Milton was inadequate. Tr. 271. Having heard the testimony of both plaintiff and Graves, I reject Lerner's conclusions and opinions as unwarranted, unfounded, and entitled to no weight at all, and find that Milton did receive appropriate and more than adequate supervision from BTL that summer, consistent with what the summer program contemplated. *See also* n.16, *infra.* It is obvious to me that Graves, a long-time BTL employee and experienced patent attorney, Tr. 683–84, with supervisory experience, Tr. 742–44, and selected by BTL to aid in administering this new summer minority program, took his responsibility seriously and, if anything, exercised more supervision over Milton than the latter felt was necessary, giving rise to a candid expression of resentment by Milton.[5] Tr. 696–97; and *see* Tr. 706–11, 714, 777–78, 794; D–45. It is noteworthy that Mr. Milton, when he was interviewed by Ms. Judith Foster, Technical Employment Representative of BTL, at the end of the summer (specifically, September 12, 1974), did not complain of inadequate supervision.[6] Tr. 921; P–11. *See also* Tr. 716–17, 726.

---

4. References herein to the pages of plaintiff's designations (P–59–63) and defendant's counter-designations (D–45–50) of deposition excerpts, which have been compiled into one volume and filed herein, are designated "Jt. Ex.____."

5. Milton, from the court's own observation, is a forceful, aggressive and self-confident individual. Indeed, at one point in the summer of 1974, he contended to Graves that a change he had made in a proposed invention made him a co-inventor. Tr. 58. Graves had to correct this impression. Tr. 708–10; and *see* Tr. 710–11.

6. During the second five-day vacation Graves took in August 1974, Urbano was assigned as Milton's supervisor. Tr. 687. Moreover, while Graves was away from the jobsite, he was available by telephone. Other attorneys were available as well. In any event, no credence is given by the court to this "inadequate supervision" claim. In terms of the specific assignments, I find Graves laid them out, defined what Milton was to do, explained each job problem, oversaw and reviewed what Milton had done, criticized and advised on Milton's work product, and did what one would expect to be done in attempting to develop in Milton an interest in patent law and a development of professional skills in a second-year law student, who was serving in effect what in a law firm would be termed a summer clerkship.

Alerted to his future role in this summer program, Graves had prepared a training prospectus. D–14. It is impressive in its reflection of thoughtful preparation, and is clearly designed to promote a budding lawyer's interest in patent law. It also demonstrates that BTL was not simply engaging in a cosmetic display of "affirmative action."

Milton having been assigned to Graves, the latter reviewed with him possible work assignments. Tr. 747–49. Milton was given an opportunity to select from the outlined assignments what he wanted to pursue.[7] Tr. 753–54.

Under this arrangement, plaintiff worked on two patent amendments, Miller 2 and 3, and two patent applications, Miller 4 and Cherin 1, Tr. 50–52, all dealing with optical fiber splicing. Stip. 12; Tr. 24. The technology involved was relatively simple. Tr. 801, 836.

Since Graves claims that it was on the basis of BTL's assessment of Milton's work that summer that it refused him permanent employment subsequently, Graves' testimony concerning this work must be examined closely.[8] This examination will be deferred at this point, however, in order to review certain events occurring during and after Milton's summer 1974 employment.

The two patent amendments and two applications to which plaintiff was assigned that summer did not require a high level of technical background or skills. Yet Graves concluded that plaintiff did not really understand what was involved and that Milton's work was technically inadequate. P–13; Jt.Ex. 113–14; Tr. 700–01.

Nor was Graves the only witness who was critical of Milton's skills. Toward the end of the 1974 summer, Michael Urbano, another BTL patent attorney, substituted as plaintiff's supervising attorney for five days and concluded that plaintiff's writing skills were grossly deficient. Jt.Ex. 14–15; Tr. 943–44.

Everett J. Olinder, defendant's assistant patent attorney director, Tr. 1000, and witness, was shown some of plaintiff's work by Graves in the summer of 1974. Well prior to any application by Milton for permanent employment, Graves told Olinder that Milton's work was unsatisfactory. Graves and Olinder met and discussed Milton's work. Olinder judged that work as poor. Tr. 1002–04.

Because to do so would not have been in the spirit of the summer program or consistent with the program's objectives, Graves did not prepare a formal evaluation of plaintiff's work at the end of the summer. Jt.Ex. 15, 93; Tr. 944. At the end of the summer, plaintiff returned to his last year of law school. Tr. 54.

On November 27, 1974 and, significantly, well prior to the time plaintiff applied for a permanent job with BTL as a patent attorney, the Atomic Energy Commission [AEC] wrote Graves, advising that plaintiff had applied and was being considered for employment as a legal intern, and Graves was asked to supply it with information on plaintiff's qualifications and potential. P–83; Tr. 702. Graves responded to this request in the following manner.

| Factors of Evaluation | Remarks |
| --- | --- |
| Personal Relationship | John is one of the tougher people to supervise that I encountered. |

---

7. Plaintiff seemingly complains that the work undertaken was not in his area of expertise. He knew this before he started work. BTL was under no obligation to "make work" for him. He knew the basic nature of BTL's functions and operations. I find no basis for this aspect of plaintiff's complaint.

8. It was Graves who had the most contact with Milton. Subsequently, when Milton's application for permanent employment at BTL was received by William L. Keefauver, head of the Patent Division, he called upon Graves for an assessment of Milton's ability.

| Factors of Evaluation | Remarks |
|---|---|
| Knowledge in His Field | John had no previous experience in Patent Law. His strengths probably lie elsewhere in the long run. |
| Mental Qualities | Medium, except in objectivity. I'd rate him needing in this dept. |
| Potential | Depends altogether on the job. John's analytical skills are probably greater in criminal law areas than in the technically more complex areas of law. |
| Work relationship – Perseverance and promptness in completion of assignments | John will give any job a reasonable and good college try. |

Tr. 706, 727–29; D–45.

Graves, in D–45, also indicated, in response to a request for an evaluation of Milton's knowledge in his field, that he had "no basis" to comment. His trial testimony made clear what was meant, namely that he, Graves, did not know for what position Milton was applying. Tr. 726–27. I find that this is what was meant. His overall evaluation of Milton, judged in the light of his testimony, was consistent, whether talking to Olinder, responding to AEC, or communicating with William L. Keefauver, Esq. Nor was Graves uncorroborated in his appraisal of Milton. Olinder and Urbano, as has been stated and will be detailed hereinafter, independently reached strikingly similar conclusions about Milton.

On January 10, 1975 plaintiff wrote Keefauver, who is General Legal and Patent Counsel and head of BTL's Patent Division, and requested he be considered for permanent employment in the Patent Division. P–12. When he received plaintiff's application, Keefauver consulted Graves, who had had the most contact with Milton during the latter's prior employment, and asked him to prepare a formal evaluation of plaintiff's performance in the summer program. Jt.Ex. 102; Tr. 1026–27. He also reviewed plaintiff's transcript at New York Institute of Technology, paying particular attention to the curriculum, which by his trained evaluation disclosed that much of plaintiff's courses there had been in liberal arts, and that the principal technical courses plaintiff had taken were in computer programming, a discipline of no great interest in terms of

patent attorney staffing, particularly at that time at BTL. Tr. 1029–30, 1056.

Judgment in determining whether to hire an individual as a patent attorney is highly subjective. *See* Tr. 443–44. On the other hand, this does not mean that such judgment cannot or should not be subjected to close scrutiny in order to determine whether such judgment is being exercised in good faith or merely a pretextual cloak for disguising racial discrimination. *Cf. Lucido v. Cravath, Swaine & Moore*, 425 F.Supp. 123 (S.D.N.Y., 1977). In fact, it is precisely because such an evaluation, highly subjective as it is, may mask racial bias, that it must be rigorously reviewed. I approach the resolution of the case with this question in mind: was Milton denied employment because he is black. Put in other terms, would a Caucasian with Milton's background, qualifications, and ability, also have been denied employment. Finally, the ultimate question must be resolved having in mind that, whether because of the dearth of patent attorneys, or otherwise, the Patent Division at BTL, with one or two exceptions, has been made up of non-blacks. *See Green v. Board of Regents of Texas Tech University*, 474 F.2d 594 (5th Cir. 1973); *Rowe v. General Motors Corporation*, 457 F.2d 348 (5th Cir. 1972).

On January 20, 1975 Graves responded to Keefauver by memorandum, Tr. 1027, stating, among other things:

John appeared satisfied with the summer program, and indeed expressed some interest in possible full-time employment. Our decision on this point, if it arises,

should take careful heed of John's relatively weak technical background. Even in the simple splicing work, he had considerable trouble recognizing critical vs. merely supportive structure and function. John appeared also to have little appreciation for development methodology, and in general how an engineer has to approach his job.

I have to conclude from John's overall performance that he is well short of qualification to undertake our minimum entrance level work in passive mechanical, active mechanical, or electro-mechanical arts. John would enjoy better progress in my opinion if he applied his energies and emerging legal knowledge in a less technically and analytically demanding area than patent law as practiced at BTL.

■ Graves' written evaluation of plaintiff, based upon his observation of plaintiff's work the preceding summer, played a significant part in Keefauver's impression that plaintiff lacked the technological background and competence to be a BTL patent attorney. On the basis of this evaluation and the other information he had obtained (from Olinder, Tr. 1028, and Keefauver's own evaluation of Milton's background, Tr. 1025–26, 1029–31) Keefauver decided against hiring him. It was Keefauver's assessment ultimately that plaintiff lacked the knowledge and skills necessary to perform entrance level patent work in the BTL Patent Division. Tr. 1029–31. On January 21, 1975 Keefauver wrote plaintiff a letter informing him that he lacked "breadth and depth" in technical training and that there was no suitable permanent position for him on BTL's patent staff. Stip. 13; P–14. I find that the decision of BTL not to offer employment to plaintiff was based upon its

well-founded opinion, supported by objective criteria, that he lacked the requisite qualifications, and that it was not based upon his race or color. See Tr. 702, 1023.

BTL's decision not to hire Milton was exclusively Keefauver's decision. I heard him testify and examined closely not only what he said but his demeanor as a witness. He impressed me as being a fair and honest person and a truthful and candid witness.[9] I find that he considered Milton's application on its merits, based on a careful evaluation of the relevant factors involved in hiring a person in the Patent Division, in the light of the information before him. I believe his testimony that his decision was not influenced or motivated by Milton's race or color. Tr. 1023.[10]

Plaintiff's cross examination of Keefauver was designed to show that BTL employed persons with varying technical backgrounds and with and without law degrees. Tr. 1073–74. It was also calculated to show that persons, even with law degrees, once in the Patent Division, had to undergo a period of supervision of as much as two or three years. Tr. 1075. None of this has any bearing on the issues before the court; it simply established that persons considered qualified for permanent employment at BTL still had to undergo lengthy and intensive training. BTL's position here is that plaintiff did not qualify for employment in the first place; and, as indicated, I so find.

Plaintiff also interrogated BTL's witnesses, including Keefauver, at length on its having hired for permanent employment two other 1974 summer employees who had been in the so-called minority program. These were Bonita Rohm, a Caucasian woman, and Raphael Monsanto, an Hispanic. Stip. 14, 17.

9. He holds a Bachelor's Degree in Electrical Engineering and an LL.B., and has been in the patent law section of BTL since 1948.

10. Plaintiff points to P–11 and its favorable evaluation of Milton by Ms. Judith Foster of BTL. Foster testified. Tr. 917–39. Her evaluation of Milton's ability and potential for future employment is meaningless. Tr. 1038–40. She had no knowledge of his work and did not communicate with anyone in the patent depart-

ment about it. Tr. 920–22. Keefauver had previously directed all summer employees be deemed "satisfactory." D–28; Tr. 1033–36. See also P–10. I believe Keefauver's testimony that he received no termination forms on any summer employees.

I further find that Keefauver's decision not to hire Milton was not based upon any belief or impression that Milton had failed to complete any assignments. See Tr. 1029–31, 1078–79.

At the time of Rohm's temporary summer employment, she was still a chemistry student at Carnegie Mellon University. P–16, P–18. She had no professional work experience in any scientific field. P–17, P–19, P–20. She had no legal training. P–24. On December 31, 1974 Rohm applied for permanent employment in defendant's patent department. Stip. 15; P–16, P–22; Tr. 1042. On March 24, 1975, following its rejection of plaintiff, defendant made an offer of permanent employment to Rohm, which included an offer for full tuition support for her law training at Seton Hall Law School. P–24. Rohm accepted and reported for work on June 30, 1975 and is presently employed by BTL. Stip. 16; P–25.

Urbano, who, as has been noted, had supervised plaintiff's work for five days in August 1974, was Rohm's supervisor throughout the entire summer program.[11] Tr. 941. Urbano reviewed the work of both plaintiff (as to Miller 4) and Rohm, and he considered her work to be technologically more demanding. Clearly, he found her work far superior to plaintiff's. Tr. 942–50. On October 22, 1974, well before Milton applied for permanent employment, Urbano wrote a favorable recommendation for Rohm, D–33, to a prospective employer, which reflected his views of her ability. Tr. 947–48, 1043. As indicated earlier herein, *supra*, at 505, Urbano, while supervising Milton in August 1974, had reviewed Milton's work on the Miller 4 project; and he found it to be "confusing" and exhibiting "serious problems with communications skills . . . with sentence structure, paragraphing, linking of ideas," etc. Tr. 943. This was in spite of the fact Miller 4 "technologically" was "extremely simple." Tr. 949. Urbano did not convey his thoughts about Milton's deficiencies to Keefauver. Thus it is not BTL's position that Keefauver relied upon Urbano in rejecting Milton's application. The defendant does rely, however, and quite properly so, upon Urbano's description of Milton's shortcomings to demonstrate that Graves and Olin-

der were not fictionalizing about Milton's failure to meet BTL's qualifications for employment.

I regard Urbano's testimony as highly significant. With the possible exception of Olinder, of all the people involved in this litigation, Urbano alone had the opportunity to compare directly and in depth plaintiff's ability with that of another summer employee, Rohm, who was hired for permanent employment. Notwithstanding Milton's greater maturity, and his two years of law school, Urbano found him to suffer by comparison with Rohm. Given the importance of Urbano's evaluation of plaintiff, his testimony had to be evaluated with great care. I find that he was testifying truthfully, without any bias toward Milton. Indeed, they had been friendly during the summer of 1974 and Milton had designated Urbano as his substitute supervisor while Graves was on vacation. Tr. 941.

When Keefauver considered Rohm's application for permanent employment, P–22, and received Urbano's endorsement, Tr. 1043, he reviewed her academic transcript with Mr. Cabe, who is in charge of a division which is physics- and chemistry-oriented, and with Mr. Torsiglieri, in charge of work on semiconductors, also physics- and chemistry-oriented. From these discussions Keefauver determined that Rohm had the background, and the potential to perform the Patent Division's work in materials and semiconductors, and that there was a need for her in that area. Keefauver recommended her for employment to the Patent Division staff directors and they offered her employment in the spring of 1975. Tr. 1041, 1085.

Monsanto, who had previously worked for the defendant in 1966, had received a Bachelor's degree in Electrical Engineering in 1969 from New York University. P–26. He received high praise from his summer supervisor, which of course came to Keefauver's attention. In considering Monsanto's

---

11. Urbano is a BTL patent attorney holding Bachelor's and Master's degrees in Electrical Engineering. Plaintiff has raised the issue that

BTL financed a substantial part of Urbano's education. Tr. 953–54. I find this to have no bearing on the issues in this case. *Cf.* Tr. 956.

application for permanent employment, Keefauver ascertained first that there was a need for an individual with Monsanto's technological background; and second, that this background justified making him an offer of employment. Tr. 1046. Having determined that he was qualified, his application, together with Rohm's were discussed with the Patent Division staff directors, who made the final decision to offer him employment. Tr. 1084–85.

Keefauver judged the academic background of Rohm and Monsanto to be of greater depth technologically, and to have a higher relevance to defendant's work, than the plaintiff's. Tr. 1044, 1046. I find adequate basis for that judgment.

Olinder, who also testified, had supervised the structure and implementation of the Patent Division's 1974 summer program.[12] He had reviewed some of the summer work done by Rohm, Monsanto and the plaintiff, and concluded that the work of Rohm and Monsanto was vastly superior to plaintiff's. When consulted by Keefauver, Olinder said plaintiff was not a suitable candidate as a BTL patent attorney, but that Rohm and Monsanto were. Tr. 1005–07, 1028. Olinder expressed the belief that "the work of Ms. Rohm and Mr. Monsanto was just head-and-shoulders above what I saw of Mr. Milton's work." Tr. 1006. Rohm and Monsanto, he felt, "were both outstanding candidates" and he recommended they both be employed.[13] Tr. 1007.

I reject the plaintiff's suggestion that BTL's failure to submit Milton's name to the directors of the Patent Division suggested discrimination. PPFF 20.[14] I accept as credible Keefauver's explanation that Milton's name did not go to the directors because he did not "pass the initial threshold level of meeting minimum qualifications. [They] only discussed those at the staff meetings, whom [sic] [they] felt were at least prima facie qualified . . . ." Tr. 1085. Thus, Keefauver made the decision in the first instance; and it was his decision which sent Rohm's and Monsanto's names to the next step, the directors' consideration, while rejecting Milton's. *Id.* Nor do I draw any inference adverse to BTL from the fact that Milton's name was not submitted to Mr. Murphy, BTL's recruitment committee head. Murphy had not had anything to do with the summer minorities program and had no knowledge of Milton's work. Tr. 1089. Moreover, in mid-January 1975 Murphy was preparing to transfer to AT&T's Patent Division. Thus, many of the employment applications received in January 1975, including plaintiff's, were reviewed and screened by Keefauver. Jt.Ex. 10.

It is not clear what plaintiff argues from BTL's hiring of Rohm and Monsanto. Presumably he contends that he has greater ability than they possess and that he should have been hired instead of them. On the other hand, he may be simply contending that his qualifications were at least as good as theirs and therefore he should have been hired along with them. In any case, having heard Urbano testify, as indicated, I accept as credible his relative evaluation of Milton's Miller 4 work on the one hand and Rohm's work on the other. I also accept as credible his appraisal of Rohm as well qualified for employment by BTL. Monsanto's supervisor did not testify. However, I accept as true Keefauver's testimony about the positive endorsement he had received as to Monsanto's work and ability. It was

---

12. Olinder graduated from the United States Naval Academy in 1943 with a Bachelor of Science degree in Electrical Engineering. He holds a Juris Doctor degree from Georgetown University Law School.

13. Olinder did not claim to be familiar in great depth with Milton's work. Indeed, the only project he saw was Cherin 1. Tr. 1009–10, 1013. Nonetheless, I found him to be an impressive witness. He was, I find, truthful in giving his personal assessment as to Rohm and Monsanto and of Milton's inadequacies, and sincere in his judgment that Milton's qualifications did not meet BTL's requirements. In this regard, I am using the term "qualifications" not in terms of curriculum or degree background but rather in terms of ability.

14. References herein to plaintiff's or defendant's Proposed Findings of Fact are designated "PPFF___" or "DPFF___."

supported to a degree by Olinder. Ironically, Monsanto himself, as an Hispanic, falls into what is popularly styled a minority category. However, I find that Keefauver testified truthfully when he stated that Monsanto, like Rohm, was hired because of his ability.

As I have already found, Keefauver's decision to reject Milton's employment application was based on the fact that Milton's ability was measured as being less than that required of newly hired employees at BTL. Keefauver, as head of the department, was qualified to assess Milton's college curriculum in terms of BTL's needs. Moreover, he had evaluations from Olinder and Graves, the latter being the most influential in Keefauver's decision. Assuming that Olinder and Graves were reporting their honest judgment on Milton's ability, and Urbano's independent evaluation suggests strongly that they were, BTL, acting through Keefauver, was justified in deciding not to hire Milton.

While not clearly stated, plaintiff seemingly contends that Keefauver acted in bad faith and on less than sufficient reliable information. Milton had worked in the company and in the patent field for three and one-half months. Two members of the division, one of which had actually served as Milton's close mentor, recommended against his employment. I find that Keefauver acted in good faith and upon the basis of adequate information, quantitatively and qualitatively, in denying Milton employment.[15]

Since Keefauver made the decision, free of racial discrimination, is that not the end of the matter? It would seem so. Certainly there is nothing in the record to suggest that Keefauver somehow knew that Olinder's or Graves' estimate of Milton was distorted by a personality conflict, as plaintiff suggests, or by racial discrimination, or by inadequate opportunity to make a realistic appraisal, yet resolutely relied upon their appraisals nonetheless. I find that Keefauver had the right to believe, and did believe, that Olinder and Graves were giving him a true, accurate, and sound appraisal of Milton's inadequacies.

Turning now to Graves' report to Keefauver, P–13; *supra*, at 507,[9] which disparaged Milton's qualifications "to undertake our minimum level work," Graves based this opinion on his "observation of Mr. Milton's performance and involvement over the course of that summer . . . And in particular . . . on his difficulty in drafting a clear, concise patent prose, clear technical description particularly in the Cherin 1 case and in the Miller 4 case." Tr. 700–01. He further testified:

> I based it, secondly, on his inability to ferret out or to perceive what the inventive part of the disclosure is as opposed to merely the surrounding structure within which an invention is practiced.
>
> I based it also upon what I considered to be a superficial appreciation of the extent to which we were involved in technology, at least in the laboratories in Atlanta.

Tr. 701. Additionally, he "would often have to tell John on three or four occasions the same thing as, for example, what . . the basic invention was of Miller case 4, only to have the next draft or work product of John to come back without this reflected."[16] Tr. 706. *See also* D–15 and Graves' testimony, (which I accept as credible) at Tr. 714, 717–19.

---

**15.** I so find as to his analysis of Milton's scholastic background and the information received from Olinder and Graves.

**16.** I reject Milton's contention, and accept Graves' testimony, as to Milton's claims that he made an improvement on Miller's invention. Tr. 706–10. I note at this point the inescapable fact that the defendant, in a sense, is in the position of having to prove that which is often very difficult to articulate. Law firms often hire or reject applicants on the basis of one or more interviews, a resume, and a transcript. The reasons for a rejection, while in good faith, are not always clearly and convincingly articulable. Thus, it is significant here that BTL had the excellent opportunity to observe Milton perform under actual working conditions and that the criticisms about his work were not only testified to at trial but were unveiled intracompany *ante litem motam*.

Milton, at trial, endeavored to convey the impression that, for the most part, he worked independently and unsupervised and that the written end products, Miller 2, 3 and 4, and Cherin 1, were almost completely his own work; and from this he argues that he manifested such a level of skill and competence that Graves', Olinder's and Urbano's evaluations were falsely stated, and thus he should have been hired. Actually, Milton went too far on this theme at trial. E.g. Tr. 50–60, 141–47. It is absurd to say that one who was still a law student, lacking any patent-drafting experience or expertise, could have acted as Milton claimed he did, largely on his own, in the complex patent-drafting field. In any event, I find that the end result of each project was either Graves' work, or represented Milton's following Graves' directions and detailed suggestions.[17] Tr. 714–26; D–15.

I further find Graves was not motivated or prompted or influenced in any way by Milton's race in making his judgment or expressing his views to Keefauver about Milton, Tr. 726, and I accept as true his testimony to that effect. I observed his demeanor, both on direct and cross examination (which was vigorously and skillfully conducted). His bearing and the manner in which he testified convince me he was telling the truth. Moreover, his testimony and his report to Keefauver were inherently consistent with his expressed views prior to plaintiff's application for employment.

I further find that Graves truly reflected his professional judgment, unaffected by racial discrimination as alleged by plaintiff, in his response to the AEC, D–45, see page 506, supra, and in his complaint to Olinder about Milton in August 1974. See pages 505–507, supra. Graves' communication to the AEC dispelled the notion, sought to be created by plaintiff, that Graves' attitude toward him was founded upon a blind and unchanging bias that arose out of an alleged personality conflict or alleged racial discrimination. See PPFF 25(d).

While Graves did downgrade Milton's technical background, he balanced this by ranking plaintiff high in perseverance and in promptness in completion of assignments. He ranked Milton as "medium" in terms of "mental qualities"; and stated that he felt Milton's strengths lay elsewhere than in the patent law field. Tr. 729. The balanced nature of this analysis was matched by Graves as he testified. He did not reflect personal animosity toward Milton and reiterated what he had earlier stated about Milton's positive qualities. It is noted that Milton characterized his relationship with Graves as "very good." Tr. 158–59.

At several points during the course of his cross-examination, Graves was questioned about his evaluation of Milton as possessing a "relatively weak technical background."

---

17. This finding, of course, requires the court to reject virtually all of the Lerner testimony. E.g., compare Lerner at Tr. 337 and Graves at 713–14; Lerner at Tr. 327 and Graves at Tr. 720–21; Lerner at Tr. 284–85 and Graves at Tr. 723–26. Indeed, Lerner's opinions were so riddled with ill-founded assumptions as to be worthless and I have so found. Supra, at 507.

While this court does not disparage Lerner's qualifications as a patent lawyer, it does question his intrusion into matters where, as here, he had to venture opinions that at best were highly speculative. His explication of reasons for his view that Milton's supervision was inadequate would have been ludicrous in a non-litigation setting. I accord no weight to his expression of opinion that Milton was qualified for employment as a patent attorney at BTL. Tr. 327, 351, 382, 390, 400–01. He had never seen the man, had no interview summary, did not know what his law school record was, was without precise or even general knowledge of how much of the written work presented to him was Milton's, and how much was Graves', and, finally, did not know what the level of intellectual quality was then and there, in 1975, being presented by applicants for positions at BTL. Lerner was prepared to and did make virtually every assumption that had to be made to arrive at an opinion favorable to the plaintiff; and his bias in plaintiff's favor was evident. His assumptions were too often not revealed before rendering an opinion. Too often they had to be drawn out of him by the court or on cross examination. It is noted that many of these assumptions would have been supported after the fact if I had accepted what Milton, who returned to the stand to give testimony after Lerner had testified, claimed to have done on his own. Tr. 560–72. I regret I cannot. Instead I accept Graves' testimony. See p. 512, supra.

Tr. 836. He impressed me with his demeanor in handling vigorous cross-examination on this subject. Tr. 828, 836–42, 854–56. I find that Graves did in fact, in good faith, arrive at the determination that Milton had a weak technical background and that there was a basis for this. Tr. 841–42.

Plaintiff also endeavored to suggest that Milton was somehow treated unfairly in that he was given too much to do. Tr. 848. Having had the opportunity to hear both the testimony of Milton and Graves, I reject this contention as unfounded.

I also find that the Cherin draft, D–80, reflecting seven apparatus claims and three method claims, was drafted by Graves, not Milton. Tr. 858–61. In this respect I accept Graves' testimony and reject so much of Milton's as is inconsistent therewith.

I further find, as to Miller 4, D–81, that the essential contributions in terms of basic ideas were made by Graves with Milton simply carrying out Graves' instructions, while acting under his direction. Tr. 861–63. That he did not even perform this well is seen in Graves' and Urbano's testimony.

Finally, other contentions of the plaintiff are resolved as follows:

1. Graves, on the basis of his own training and experience, was in fact competent to judge the quality of Milton's work and his ability and competence to do the work required by BTL in its Patent Division. Tr. 864–66. It is clear Keefauver thought so and that he relied upon Graves' assessment. He was right to do so.

2. Moreover, Graves had sufficient opportunity to observe Milton. He was not simply a co-worker of Milton's; rather he was his supervisor and responsible not only to Milton but to BTL for guiding Milton's day-to-day activity. Tr. 866–67.

3. Plaintiff, arguing that Graves never told him that he was not qualified to work at BTL, states that this demonstrates that

Graves' report to Keefauver was contrived and pretextual. I reject this contention. Graves made it clear that the summer program was not designed as a pre-employment situation; instead, it was merely "an exposure program." Tr. 884. It is unthinkable that Graves would impair his standing at BTL by lying to Keefauver about Milton. It is also unthinkable that Keefauver directed Graves to falsely state his appraisal of Milton so that the two of them, thus conspiring, could "build a record" upon which to stand. I find absolutely no basis for inferring such venality from the evidence; and I reject unreservedly plaintiff's contentions to this effect.

4. I give no weight to the material embodied in P–15, a Navy Department form purporting to set forth what Graves told a clerk about plaintiff in a telephone conversation. I believe Graves' responses at trial to questions put to him about this document. Tr. 731–38, 813–14. While admissible, this document was entitled to little weight, given the circumstances under which it was completed by the Navy employee.

## DISCUSSION

▄▄▄ The issue here is easily drawn. Plaintiff urges that he was not hired for permanent employment by BTL's Patent Division because he is black. Defendant denies this and contends that its refusal to hire plaintiff was founded upon a legitimate and warranted assessment of his ability and a well-considered decision that his ability did not measure up to that level of competence which BTL sought and wanted in its newly-hired people in its Patent Division. The key then to resolution of the dispute is to be found in the determination of whether Milton was "qualified" as that term is used in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[18]

---

**18.** *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), at least so far as the Title VII claim is concerned, [and 42 U.S.C. § 1981, *see Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)], sets out the guiding principles for a case such as this. Thus *McDonnell Douglas* sets forth the facts which must be proved by the plaintiff to establish a prima facie case of employment discrimination as follows:

This is not a case where a black applies for a menial job and is rejected on the basis of an interview, supplemented perhaps by a resume. Plaintiff, when he applied for a permanent position, was already known to defendant's Patent Division. When Keefauver determined not to hire him, it was against a background of BTL having had an opportunity, through Graves and, to a lesser extent, Olinder, to examine under close supervision Milton's actual work in the field in which he would have worked at BTL if he had been hired on a permanent basis.

Moreover, as I have noted, the job that Milton sought was not a menial one. Indeed, the field in which Milton sought employment as an attorney is rather complex, both technically and legally. Thus, the word "qualified" has much more content in this case than it would if we were dealing with an instance of refusal of a job as laborer, clerk, or other unskilled position to a black applicant.

Plaintiff's claim raises several critical questions:

1) Did Graves falsely state his own subjective impressions in his memorandum, P–13, to Keefauver;

2) Did Graves' memorandum truly reflect his own impressions, but inaccurately assess Milton's abilities;

3) Did Graves' memorandum, taken at face value, justify Keefauver's turning down Milton's application;

4) If the answer to 3) is in the negative, was BTL's refusal of employment to Milton justified if Keefauver mistakenly read more out of this memorandum than was there but did so honestly and in good faith;

5) Is there any evidence to indicate that while Keefauver still could have overridden Graves' recommendations, he did not do so because Milton was black;

6) Did Graves and Keefauver conspire to create a record to justify rejection of Milton, that is, while feeling he was qualified, did they agree that Graves would fabricate a record upon which Keefauver would act, knowing it was a false base.

Some of the questions thus raised have already been answered. For purposes of presenting a coherent response, however, I shall, to the extent required, reiterate that which has already been stated, and in the same order the questions were presented. My findings follow:

1) Graves did not falsely state to Keefauver his own subjective impressions of Milton's ability. *See* pp. 512–514, *supra.*

2) Graves' memorandum to Keefauver not only truly reflected his own impressions of Milton's ability; it also accurately assessed Milton's ability. This finding is based not only upon the reasons Graves himself gave for arriving at his conclusion as to Milton's ability, see pp. 512–514, *supra*; it is also supported by the credible testimony given by Olinder and Urbano. *See* pp. 509–511, *supra.*

This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was *qualified* for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.
*Id.* 411 U.S. at 802, 93 S.Ct. at 1824 (emphasis added); *see also General Electric v. Gilbert,* 429 U.S. 121, 136–137, 97 S.Ct. 401, 50 L.Ed.2d 343 (U.S. Dec. 7, 1976); *Ostapowicz v. Johnson Bronze Co.,* 541 F.2d 394, 402 (3d Cir. 1976), *cert. denied,* —— U.S. ——, 97 S.Ct. 741, 50 L.Ed.2d 753 (1976); *Jurinko v. Edwin L. Wiegand Company,* 528 F.2d 1214 (3d Cir. 1975).

Under his § 1981 (and thirteenth amendment) claim, plaintiff must establish that he was unable to make a contract that a Caucasian in his position would have been able to make. *Cf. Long v. Ford Motor Co.,* 496 F.2d 500, 504 (6th Cir. 1974). As I have stated, I do not find plaintiff was treated differently because of his race. That the provisions of § 1981 roughly parallel, in their requirements, the prohibition against employment discrimination in Title VII, 42 U.S.C. § 2000e, (1974), is clear. *Brady v. Bristol-Myers, Inc.,* 459 F.2d 621 (8th Cir. 1972). *See generally* Developments in the Law, Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv.L.Rev. 1109 (1971).

3) Graves' memorandum, taken at face value, justified Keefauver's decision not to hire Milton. If Milton had been Caucasian, there could be little argument about the fact that Keefauver, having turned to Graves for comment, would be fully justified in declining employment to Milton. Put another way, in a law firm context, it would have been folly for one in the position of a hiring partner to have rejected the advice of a trusted and experienced senior attorney who had closely supervised the applicant over three and one-half months in the very field in which employment was being sought. The period of time and opportunity for observation gave force to Graves' statement; and it is evident that Keefauver had confidence in Graves' appraisal. Moreover, Keefauver had received a degree of confirmation from Olinder. Additionally, he had initially interviewed Milton himself and was familiar with his college curriculum. I find Keefauver was justified in relying upon Graves' memorandum in declining employment to Milton.

4) Given the answer to 3), this question is inapplicable.

5) I find no basis to conclude that while Keefauver could have overridden Graves' recommendation and advice, he did not do so because Milton was black. I have previously found that Keefauver's decision was not based upon Milton's color or race. *See* p. 508, *supra.*

6) There is no evidence to indicate that Keefauver, having decided not to hire Milton because he is black, directed or requested Graves to falsify a record in the form of P–13 to justify his rejecting Milton's application. As I have previously stated, *supra*, at 513, I find this suggestion unthinkable. As I have already found, Keefauver and Graves were telling the truth when they testified before me. Accordingly, this question is resolved against the plaintiff.

Applying the *McDonnell Douglas* formulation, plaintiff, it is determined, was not "qualified" in that sense. Accordingly, judgment will be entered, with costs, in favor of the defendant and against the plaintiff.

### Damages

I shall make findings on the damages element of plaintiff's case so that, in the event of appellate reversal of this court's decision on the merits, another trial will not be required.

### Compensatory Damages

■ Plaintiff's claim that damages in the form of back pay should start in January 1975, when he submitted his application, is denied. He was applying for permanent employment to commence after his graduation in June 1975. Assuming a starting salary of $12,500 per annum, he would be entitled to that pro rated from June 1, 1975, until he took a job in September 1975 with the Navy at about $12,000.[19] Thereafter, in October 1975 he began employment at ERDA at $14,500. He received regular raises and, since September 1976, has been earning $20,400 at EEOC.

He would be entitled to his moving charges of approximately $800, required to move from New Jersey to Washington to take his position with the Navy in September 1975.

### Punitive Damages and Counsel Fees

■ I found no evidence of bad faith on defendant's part so as to warrant an award of punitive damages, even though the amount suggested by plaintiff, $1,000, is a modest one. It is inappropriate to decide the question of counsel fees at this point.

### Defendant's Application for Counsel Fees

■ Defendant's application for counsel fees is denied. There has not been shown that degree of bad faith which would justify imposing upon the individual plaintiff

---

**19.** The difference between $12,500 and $12,000 is minimal. In any event, by October 1975 Milton was making more than he would have been at BTL.

the counsel fees of the defendant. *United States Steel Corporation v. United States*, 519 F.2d 359 (3d Cir. 1975); *and see E.E. O.C. v. Christiansburg Garment Company, Inc.*, 550 F.2d 949 (4th Cir., 1977).

The foregoing sets forth my Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52.

The form of judgment should be settled within seven days, either on consent, or on two days' notice. It should provide for costs in favor of the defendant and against the plaintiff, unless, or course defendant is willing to waive costs.