**Horace DENTON, Plaintiff,**

v.

**INTERNATIONAL BROTHERHOOD OF BOILERMAKERS, IRON SHIP BUILDERS, BLACKSMITHS, FORGERS & HELPERS; Boilermakers Local #29; Harold J. Buoy; and Fred B. Hayes, Defendants.**

Civ. A. No. 84–2760–WF.

United States District Court, D. Massachusetts.

Sept. 5, 1986.

Paul L. Nevins, Philip R. Olenick, Boston, Mass., for plaintiff.

Paul F. Kelly, Segal, Roitman & Coleman, Boston, Mass., Steve A.J. Bukaty, Blake & Uhlig, Kansas City, Kan., for defendants.

## MEMORANDUM AND ORDER

WOLF, District Judge.

Plaintiff Horace Denton, a black welder, initially brought this action charging that defendant Boilermakers Local 29 ("Local 29") had discriminated against him in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, and committed unfair labor practices pursuant to 29 U.S.C. § 158(b)(1)(A).[1] Denton also alleged state law claims against Local 29 for intentional infliction of emotional distress and breach of the union's duty to deal with him in good faith. This court denied defendant's motion for summary judgment on plaintiff's Title VII claim for relief, but granted summary judgment on all other claims for relief against Local 29. *See Denton v. International Brotherhood of Boilermakers et al.*, 653 F.Supp. 55

(D.Mass.1986).[2] The Title VII claim was tried to the court.

For the reasons discussed below, the court hereby finds that Local 29 discriminated against Denton based on race in violation of Title VII, 42 U.S.C. § 2000e *et seq.*

More specifically, the court finds that beginning in 1979, Local 29 continuously harrassed and discriminated against Denton because he was black. This conduct commenced after Denton took advantage of a voluntary, private quota to promote the employment of minorities in the building trades. The most recent, discrete act of racial discrimination occurred in December, 1982 when Local 29 denied Denton the opportunity to become a field construction journeyman. Denton filed a complaint with the Equal Employment Opportunity Commission in August, 1982. Thus, the applicable statute of limitations does not bar the relief he seeks for either the continuing violation of his civil rights by Local 29 which began in 1979 or for the violation which occurred in December, 1982. Further proceedings will be required to fashion an appropriate remedy and to determine reasonable attorney's fees.

## I. FINDINGS OF FACT

Based on the evidence presented at trial, which afforded the court the opportunity to judge the credibility of the witnesses, whose testimony conflicted in material respects, the court hereby finds that the plaintiff has proven the following facts by a preponderance of the evidence.

Plaintiff, Horace Denton, who is black, was born in Jamaica. He has resided in the United States since 1969. He is married and has six children. Denton attended high school in Jamaica. He received a two

---

1. The parties stipulated to the dismissal of all of the claims against the International Brotherhood of Boilermakers and Harold J. Buoy, president of the International, who were named as defendants in the original complaint. In addition, claims against another original defendant, Frederick B. Hayes, the business manager of Local 29, were dismissed by this court. *See Denton v. International Brotherhood of Boilermakers, Iron Ship Builders, Forgers and Helpers et al.*, 653 F.Supp. 55 (D.Mass.1986).

2. At a hearing on March 21, 1986, the court denied plaintiff's motion to amend the complaint to add a claim because the proposed amendment failed to state a claim on which relief could be granted and, therefore, would have been futile.

year certificate in Jamaica for auto mechanics and welding. In 1969, Denton received further vocational training in a program run by General Welding Works in Toronto, Canada. Denton participated in this program for approximately eight months.

Denton worked as a heliarc welder at Hershey Products in Dedham, Massachusetts from 1970 to 1972. In 1972, Denton left the Hershey employment for a job as an electrical welder with Westinghouse in Readville, Massachusetts.

Defendant, Boilermakers Local 29, is a labor union that represents employees in the boilermaker and ship building trades in New England. Among these employees are welders. Local 29 is affiliated with and subject to the constitution of the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers, and Helpers (the "International").

Local 29 represents Boilermakers with regard to terms and conditions of employment. Those represented include Boilermakers who work in a plant or shop and Boilermakers who work at field construction job sites. Field construction jobs pay a higher hourly wage than shop positions.

During the period relevant to this case, the constitution of the International established criteria for membership in Local 29 and other affiliated unions. All members of Local 29 did not, however, have equal status or rights. The higher paying field construction welding jobs, for example, were offered first to union members who had achieved the status of "field construction journeymen." Only they were put on Local 29's "out of work list," from which field referrals were, at least initially, made. Only if there were insufficient interested field construction journeymen to staff a job would other union members be offered the opportunity to work in the field as "permit hands."

Local 29 established criteria for achieving field construction journeyman status and thus for eligibility for placement on the out of work referral list. During the period relevant to this case, field construction journeyman status was highly desirable because there were not enough field opportunities to employ fully all Local 29 welders.

Both before and after November 1, 1982, a Local 29 Boilermaker who obtained 8000 hours of field construction experience or satisfactorily completed the Local's apprenticeship program achieved field construction journeyman status and, therefore, became eligible for placement on the out of work list.

Prior to November 1, 1982, there was an additional method for achieving field construction journeyman status in Local 29. In that period, a union member who had 4000 hours of field construction experience was eligible to take a written examination. If he passed the written examination, he became a journeyman and qualified for the out of work referral list. During the period the written examination was administered, all Boilermakers who took the written test passed the exam.

In the course of this case, Local 29 claimed that in addition to the 4000 hour requirement, a union member had to be working at his trade within the jurisdiction of Local 29 to be eligible to apply to take the written exam.

From 1972 to 1978 Denton was periodically referred by Local 29 to various construction jobs, as a permit hand.[3] During this period, he worked as a certified welder at several field construction sites around New England. Denton accumulated approximately 4,100 hours of field construction experience. The officials of Local 29 regarded him as a good worker and welder.

In 1978, Denton had been out of work for about eight months, notwithstanding his continuous efforts to obtain employment through Local 29. As his unemployment

3. As discussed further in the Conclusions of Law, the history of Denton's relationship with Local 29 is relevant evidence concerning the issue of discriminatory intent relating to acts within the applicable statute of limitations and to the issue of whether a continuing violation, including a discrete act within the statute of limitations, occurred.

benefits were about to expire, he accepted employment obtained by the Third World Job Clearinghouse at a Harvard Medical Center construction project in Boston; the project was known as the Medical Area Total Energy Project ("MATEP"). The Third World Job Clearinghouse was an organization that recruited, trained and found jobs for members of minority groups at union job sites in the Boston area.

The general contractor for the MATEP project was United Engineers. As part of its contract with Harvard University, United Engineers agreed to hire a work force which included at least thirty percent minorities.

United Engineers also had a collective bargaining agreement with Local 29, which was to supply boilermakers, including welders, for the MATEP project. Less than a dozen of Local 29's six hundred members were black; not all of them were journeymen. In 1978, there were Local 29 journeyman welders out of work. Thus, Local 29 would not refer non-journeymen like Denton to the MATEP project.

As Local 29 could not or would not supply the minority workers required to meet United Engineers contractual obligation to Harvard, the contractor "gate hired" minorities obtained through other sources. These included Denton and three other minority welders referred to United Engineers by the Third World Job Clearinghouse.

Although not referred by Local 29, the minority "gate hires" on the MATEP job were paid union wages and, in turn, paid dues to Local 29. Although Local 29 filed, and claims to have won, a grievance against United Engineers based on the assertion that the "gate hires" of minorities was a violation of the collective bargaining agreement between the company and the union, Local 29 has at no time claimed that it had a legitimate complaint concerning Denton or the other minorities who were the beneficiaries of the quota agreed upon by United Engineers and Harvard. To the contrary, Local 29's witnesses characterized Denton and those similarly situated as "blameless" "victims" who were "used" by United Engineers. The court also finds that Local 29 had no legitimate reason to punish Denton for accepting the employment with United Engineers which he obtained through the Third World Clearinghouse.

While at the MATEP job, however, Denton was harassed and discriminated against by the union and its members because of his race. Denton and the other minorities referred by the Third World Clearinghouse were given demeaning job assignments, below their skill levels, by union representatives. They were also subjected to repeated namecalling by union members at the MATEP site.

At one point, several of the minority "gate hires" were sent by a union official on the site to the union hall to regularize their status with Local 29. When the workers returned to the job site, they were discharged by the foreman, appointed by the union, on the pretext that their absence was not authorized. United Engineers subsequently intervened to reinstate Denton and his minority colleagues.

In another incident of harassment, Denton was stranded in a sky climber, approximately two hundred feet above the ground, when a union member pulled the plug on the electrically operated machine. Denton called a black union member, who was his friend, and asked him to reconnect the electricity. His friend said that he could not reconnect the electricity because the other union members would kill him. Denton was forced to slide down a pole to safety.

When Denton reached the ground, many union members were laughing at him. Denton informed the Local 29 shop steward and foreman of the incident. They, however, made no effort to investigate Denton's complaint. The shop steward did ultimately acknowledge that he was aware that a union member had pulled the plug. However, no further investigation was made and no disciplinary action was taken against any union member.

Denton was ultimately discharged from the MATEP job after being assigned to repair a non-functioning junction box. The assignment, which could not have been performed properly by any welder, was a pretext to provide grounds for Denton's discharge. Denton was given his final paycheck with the words "Unacceptable Job" written on it.

Winston Ross, a black field construction journeyman who had been referred to the MATEP project by Local 29, was subpoenaed by plaintiff and thus, in effect, compelled to testify. He too was the victim of racial harassment and discrimination at MATEP. United Engineers had undertaken to meet the thirty percent minority quota for overtime assignments on the MATEP project. Before the "gate hires" were employed at the site, Ross had been pressured into refusing to work overtime. A union member informed Ross that he would "be sorry" if he accepted overtime. Because of this threat and the general level of racial tension, Ross decided to leave the MATEP project. He explained this to Edward Hancock, then the Local 29 business manager, who helped Ross find other employment in Louisiana. Ross accepted this employment to get as far away as he could from the racially charged Local 29 environment.

Thus, the court finds that Local 29 officials and members racially discriminated against Denton and some other minorities on the MATEP project.

On January 29, 1979, approximately four months after Denton was discharged from the MATEP job, he filed a complaint with the EEOC alleging racial discrimination. Plaintiff sought to join the union and become a field construction journeyman; he apparently then considered membership to be synonymous with journeyman status. He asserted that he was told that he needed 8000 hours of field construction experience to join the union and claimed he was being denied union membership based on race.

On May 22, 1979, Denton and Local 29 agreed upon a settlement of this EEOC charge. The written settlement agreement provided that Denton would withdraw his charge and not file suit. In the written agreement, Local 29 agreed to provide Denton with a letter of recommendation and to contact four employers about the possibility of providing work for him. The letter of recommendation would include a statement of the 4000 hours of field construction experience acquired by Denton.

During the course of the settlement discussions before the EEOC, Hancock, the business manager of Local 29, informed Denton that if he accepted employment in a "shop" job for a short period of time, he would become eligible for full union membership. Hancock explained that this period of time would provide a chance for the Local 29 membership to "cool down" in the aftermath of the dispute over the MATEP minority hiring quota. Hancock did not mention a test requirement at this point; nor did he say a welder had to be employed to apply to take a test to become a journeyman.

Following the settlement agreement, Denton, through Hancock, received a "shop" job at the Hodge Boiler Works. While working at Hodge, Denton's shirt collar was set on fire by a member of Local 29, as other union members laughed at him. Denton told the Local 29 shop steward of the incident. The steward made no effort to investigate this claim of harassment or to act on it in any other way.

Denton's problems at Hodge were related to the difficulties he encountered at MATEP. For example, while at Hodge, Denton was asked repeatedly by at least one Local 29 member why he had left the MATEP job.

Denton was required to work sixty days at Hodge to become eligible to apply for union membership. On October 19, 1979, after working sixty days, Denton applied for union membership and paid his initiation fee. On or about the same date, because of the discrimination and harassment he was experiencing, Denton left Hodge.

Shortly after leaving Hodge, Denton became a member of Local 29. He was not, however, given journeyman status. Nor was he then told that a test was required to become a journeyman or that he would have to be working as a welder to be eligible to take such a test.

After becoming a member of the Union, Denton continually sought job referrals from Local 29. He was, however, never again given work as either a permit hand or a journeyman.

At times, there was work available through Local 29 for welders who were not journeymen. In 1980, Local 29 referred white workers on a permit basis to the Brayton Point power plant construction project, but refused to refer Denton. More specifically, Winston Ross asked Hancock to refer Denton for work as a permit hand at Brayton Point because others were being given such work. Hancock told Ross that Denton would be referred for work "over my dead body."

On August 4, 1982, Denton filed a second EEOC charge of racial discrimination against Local 29. In connection with the EEOC process, Denton was told for the first time that a test, as well as 4000 hours experience, was required to become a journeyman. Denton received authorization to sue from the EEOC on September 22, 1982. At this point, the EEOC assisted Denton in retaining the services of an attorney.

Denton's attorney, orally and later in a letter of November 24, 1982, asked Local 29 to give Denton the exam to qualify for field construction referrals. On December 17, 1982, Local 29 responded that the last test had been given. The letter further stated: "The Local knows of no other individual with more than 4000 hours who expressed a desire to take the test." Local 29 concluded the letter by stating that if the International granted permission, Local 29 would give the test again for Denton.

In October and November, 1982, Denton's attorney also wrote letters to Harold Buoy, President of the International, reiterating an earlier request that Local 29 administer the test to Denton. By letter of December 20, 1983, Buoy responded that Local 29 had informed him that there was a Local 29 rule requiring that an individual be working in the Local at the time a request for an exam was made. Because Denton was not then employed, Buoy concluded he could not apply to take the exam.

Thus, Local 29 told Denton he could take the exam if the International approved, but the International refused approval because of Local 29's purported rule.

The purported rule that a member had to be working to apply to take the test to achieve journeyman status, and the enforcement of that purported rule with regard to Denton in the circumstances of this case, were pretexts for continued racial discrimination against Denton by Local 29. This purported rule was not reflected in any writing. The witness representing the International, Joseph Meredith, testified that nothing in the International's constitution imposed this restriction.[4] Yet, Local 29 maintained at trial that the purported requirement had been established by the International and that Local 29 did not have the discretion to disregard it.

Similarly, Local 29's refusal to refer Denton for work in order to satisfy any purported requirement that he be employed to apply to take the journeyman test was also a pretext for continued racial discrimination to exclude him from journeyman status. The union knew that Denton wanted to work and wanted to become a journeyman. There was work available for welders and permit hands. In the fall of 1982, John Wisknot, a white welder who had 4000 hours experience, was working. Local 29 administered Wisknot the exam so

---

**4.** Article XXV Section 1 of the International's constitution did provide that an applicant for membership in the union must be working at the trade. Denton had accepted employment at Hodge to satisfy this requirement and became a member of the Union. The International's rep-

resentative, Joseph Meredith, testified at trial that the International's constitution did not require Denton to be working at the trade to take Local 29's test to achieve journeyman status; he understood that to be a requirement established solely by Local 29.

that he would not be unfairly disadvantaged when 8000 hours experience was made the sole means of achieving journeyman status. Yet Local 29 refused to give Denton the exam or the work it claimed would make him eligible for the exam.

If Denton had taken the test he would have passed. No Local 29 welder had ever failed, and the officials of Local 29 uniformly testified that Denton was a good worker and welder.

There was no legitimate, nondiscriminatory reason for Local 29's decision in December, 1982 to deny Denton journeyman status or the opportunity to achieve it. The purported rule on which Local 29 relied, the invocation of it, and Denton's inability to then work at his trade were merely pretexts for continued and discrete manifestations of Local 29's racial discrimination against Denton as a black who had obtained employment at MATEP as the beneficiary of a quota. Race was the determinative factor in Local 29's decision to deny Denton the opportunity to take the exam and become a journeyman in December, 1982.

Several times in early 1983, Denton appeared at the union hall to pay his union dues. While at the union hall, Denton sought referrals by writing his name on the "out-of-work" list. From at least December, 1982 to September, 1983, Local 29 referred some permit hands to field construction jobs. Denton was not referred to work during this period either as a permit hand or as a journeyman.

On August 2, 1983, plaintiff filed with the EEOC a third charge against Local 29 alleging racial discrimination in the union's referral practices.

On June 8, 1984, the EEOC authorized Denton to sue. On September 5, 1984, plaintiff brought this action.

## II. CONCLUSIONS OF LAW

### A. *Liability*

Denton has alleged disparate treatment claims of discrimination. Specifically, plaintiff has asserted that Local 29 violated his rights under Title VII by refusing to refer him for employment and by excluding him from field construction journeyman status. *See* 42 U.S.C. § 2000e–2(c).

### 1. *Proof of the Disparate Treatment Claim*

The First Circuit has recently described the burdens of production and persuasion required in Title VII disparate treatment actions:

Under the analytical framework provided by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), a plaintiff asserting a disparate treatment claim must first establish a *prima facie* case of discrimination by a preponderance of the evidence. If he or she succeeds, the defendant must articulate a legitimate, nondiscriminatory reason for its challenged actions. If defendant does so, plaintiff must then prove by a preponderance of the evidence that the asserted reason is a mere pretext for unlawful discrimination. *See Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207.

*Dance v. Ripley,* 776 F.2d 370, 372 (1st Cir.1985). In this case, the court finds that plaintiff has met his burdens of production and persuasion and has proved his disparate treatment claims.

### a. *The Prima Facie Case*

Generally, to establish a *prima facie* case under Title VII, a plaintiff must prove four factors. He must show:

(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. at 1824. In *McDonnell Douglas,* the Supreme Court added, however, that the four part model would not necessarily

be applicable in every respect to differing factual situations arising under Title VII claims. *Id.* at 802, n. 13, 93 S.Ct. at 1824, n. 13.

Plaintiff's initial burden is not an onerous one. *Dance v. Ripley,* 776 F.2d at 372; *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. In essence, "the plaintiff must prove by a preponderance of the evidence that [he] applied for an available position for which [he] was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093.

The court finds that Denton has established a *prima facie* case. Denton has shown that he was a member of a racial minority, was qualified to do the required work, and repeatedly sought journeyman status and field construction employment referrals from Local 29 from November, 1979 to August, 1983. Local 29 denied his requests for referrals and refused to grant him journeyman status. The most recent, formal refusals occurred by the letters sent to Denton on December 17, 1982 and December 20, 1982.

By 1979, Denton had accumulated over 4000 hours of field construction experience. Denton then had training and proven experience in the field as a qualified welder. Denton's ability to perform was conceded, not contested, by the defendant.

While Denton's requests to be referred on a permit basis were being denied by Local 29, white workers with qualifications similar to his were referred to work at Brayton Point and elsewhere. During the period Denton sought to upgrade his union status, other white workers with less than 8000 hours of experience were granted journeyman status. The union also administered a special qualifying exam to a single white worker who had more than 4000 but less than 8000 hours of experience, but refused to give the same test to Denton.

Thus, Denton presented a *prima facie* case and this evidence established an inference of unlawful discrimination.

### b. *Articulation of Legitimate, Nondiscriminatory Reason*

In view of the foregoing, Local 29 had the burden of producing evidence that Denton was excluded from achieving journeyman status for a legitimate, nondiscriminatory reason. That evidence had to be sufficient to raise "a genuine issue of fact as to whether [the defendant] discriminated against the plaintiff." *Burdine,* 450 U.S. at 254–55, 101 S.Ct. at 1094. Through the introduction of evidence, defendant was required to set forth the reasons for plaintiff's rejection. *Id.* Local 29 met this burden of production.

Local 29 presented testimony that Denton was excluded from becoming a journeyman because he was not eligible for such status under Local 29's established rules. Local 29 claimed that to be eligible to become a field construction journeyman in Local 29 in 1982, a Boilermaker needed to accumulate 4000 hours of work experience, apply to take a written examination while working at the trade within the Local's jurisdiction, and pass the test. Defendant asserted that the exam could not be administered to Denton in the fall of 1982 because Denton was not then working in the trade. Local 29 further claimed that plaintiff could not become eligible after November 1, 1982, because after that date, accumulating 8000 hours of field construction experience became the sole means of becoming a field construction journeyman.

Local 29 also presented evidence regarding the reason for the union's failure to grant plaintiff referrals on a permit basis. Defendant claimed that plaintiff never sought permit work when such work was available after 1979. Local 29's counsel also argued that no permit work was available from December, 1982 to August, 1983.[5]

With the evidence described above, Local 29 articulated a nondiscriminatory reason for its exclusion of Denton from journeyman status and field construction employ-

---

**5.** Defendant maintains that this timeframe is the only relevant period because earlier claims are time-barred. *See* "Statute of Limitations" discussion below.

ment. Therefore, the burden shifted back to Denton to produce evidence sufficient to prove by a preponderance of the evidence that Local 29's asserted reason for excluding him from journeyman status was a pretext for unlawful discrimination.

### c. *Proof of Pretext*

At this stage of the analysis, plaintiff's burden became joined to his burden of persuasion on the ultimate issue. *Burdine*, 450 U.S. at 255, 101 S.Ct. at 1094. Denton was required to convince the court that he was a victim of intentional discrimination. *Id.* See also *Lamphere v. Brown University*, 685 F.2d 743, 748 (1st Cir. 1982). A plaintiff may succeed in this proof either (1) by directly persuading the court that a discriminatory reason was more likely than the employer's asserted reason to have motivated the employer, or (2) by indirectly showing that the employer's explanation is not credible. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *McDonnell Douglas*, 411 U.S. at 804–05, 93 S.Ct. at 1825. Denton did both.

After considering all the evidence presented at trial, including the testimony and documentary exhibits, the court concludes that Denton has proven by a preponderance of the evidence that a discriminatory reason motivated the defendant's decision to exclude him from becoming a field construction journeyman in December, 1982, and that Local 29's alleged reasons for that exclusion were a pretext for racial discrimination. By this unlawful exclusion, defendant prevented plaintiff from receiving field construction work which he sought from December, 1982 through Spring, 1983. This action by the union was part of a continuing pattern of discriminatory treatment of Denton which began in 1979.

In deciding that Local 29's December, 1982 decision to deny Denton the opportunity to take the test and, in this fashion, to deny him journeyman status and rights, the court has not looked at that event in isolation. Rather, in assessing credibility and discerning intent the court has considered the proven facts concerning Local 29's previous treatment of Denton and other blacks similarly situated. *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825 ("Other evidence that may be relevant to any showing of pretext includes facts as to the petitioner's treatment of respondent during his prior term of employment; ... and petitioner's general policy and practice with respect to minority employment.") These events, even if they occurred outside the statute of limitations, constitute relevant background evidence which sheds light on the union's December, 1982 action to prevent Denton from becoming a journeyman. *Cajigas v. Banco de Ponce*, 741 F.2d 464, 470 n. 13; *United Airlines v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977).

The evidence proved that racial discrimination against Denton by union members and union officials began with plaintiff's employment at MATEP in 1978. Local 29 is responsible for the racially motivated harassment of Denton at MATEP by its members, because its officials knew of that harassment and did not investigate or otherwise act to prevent or punish it. *See DeGrace v. Rumsfeld*, 614 F.2d 796, 803 (1st Cir.1980) ("An employer may not stand by and allow an employee to be subjected to a course of racial harassment by co-workers and thus defendants must accept responsibility for their supervisors derelictions ... in responding to the racial problem....") Hancock, the business manager, knew of the racially hostile atmosphere at MATEP, for it was explained to him by Ross, whom he helped to find work in Louisiana. The shop steward knew that a white union member pulled the plug stranding Denton in the sky climber, but took no action concerning it.[6] A union official sent Denton and other blacks from the job site to the union hall and then tried to fire them on the pretext that their absence was unauthorized. Ultimately, the union used another pretext to discharge Denton.

---

**6.** The evidence indicated that the shop steward was black. This, however, does not mean the steward's conduct could not constitute or contribute to a violation of Title VII by Local 29.

The evidence that Denton was harassed and discriminated against by Local 29 at MATEP is also evidence that Local 29's later decisions concerning Denton, including the December, 1982 decision to exclude him from becoming a journeyman, were similarly motivated. Local 29's counsel, however, argued that any proven discrimination did not violate Title VII because it was not racially motivated; he contended that any animosity toward Denton by the union was motivated by the fact that Denton obtained the MATEP job through the Third World Clearinghouse, rather than through Local 29.

Alternatively, Local 29's counsel suggested that this is at most a case in which Local 29 had mixed motives in excluding Denton—motives relating to labor relations and to race—and, therefore, that Denton had not borne his burden of showing that race was the determinative reason for his exclusion from journeyman status. *See Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Mack v. Cape Elizabeth School Board,* 553 F.2d 720, 722 (1st Cir.1977); *DeGrace,* 614 F.2d at 802. The union's counsel's contentions, however, have proven unpersuasive for two reasons.

First, the claim that Denton was discriminated against because he was referred by the Third World Clearinghouse was not presented by the testimony of any witness. Each witness on behalf of Local 29 denied that there was any discrimination against Denton for any reason. Indeed, Hancock testified that while he felt that United Engineers had violated its collective bargaining agreement with Local 29 by accepting referrals from the Third World Clearinghouse, he at all times also felt that Denton and the other beneficiaries of the United Engineers quota had not violated any applicable agreement, but were merely "blameless" "victims" who had been "used."

Where, as here, there is an absence of evidence of a legitimate motive—or an illegitimate motive not proscribed by Title VII—there is no basis for finding mixed motive. *Burdine,* 450 U.S. at 255, n. 9, 101 S.Ct. at 1094, n. 9 (To rebut presumption of illegal discrimination created when plaintiff presents *prima facie* case, "an articulation not admitted into evidence will not suffice. Thus, the defendant cannot meet its burden merely through an answer to the complaint or by argument of counsel.")

Second, the court concludes that in the context of this case, discrimination against or harassment of Denton because he was the beneficiary of a racial quota filled in part by referrals from the Third World Clearinghouse would constitute discrimination or harassment based on race proscribed by Title VII. Only minorities were beneficiaries of the United Engineers quota. Only minorities were referred by the Third World Clearinghouse to United Engineers. Thus, only minorities would have been singled out for discrimination and harassment by Local 29 at MATEP, if Local 29's counsel's argument concerning his client's motivation was supported by evidence in the record. It appears to this court that the reason for discriminating on the basis of race is legally irrelevant. Discrimination in employment because of race, whatever the motive for the racial animosity, is prohibited by Title VII. 42 U.S.C. § 2000e–2(c).

■ Cases involving affirmative action programs often present difficult issues. *See e.g., United Steelworkers of America v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979); *Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984); *Local 28 of the Sheet Metal Workers International v. EEOC,* — U.S. —, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986); *Local No. 98, International Assoc. of Firefighters v. Cleveland,* — U.S. —, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986). The legality or desirability of affirmative action programs are, however, not at issue in this case. Voluntary, private affirmative action programs are legally permissible. *Weber* 443 U.S. at 197, 99 S.Ct. at 2724. There are established and effective means for unions and their members, among others, to prevent or challenge affirmative action programs. These means

include the collective bargaining and grievance process, the legislative process, and litigation. Local 29's counsel's argument would, if supported by the evidence, put at issue in this case whether a union may harass and discriminate against a black because he was the beneficiary of an affirmative action program. The court believes that Title VII prohibits such discrimination.

The sequence of events following the MATEP employment has been fully described in the Findings of Fact. The harassment of Denton at Hodge constituted a continuation of racial discrimination against him. Such discriminatory actions are attributable to the union because Local 29's steward refused to investigate or otherwise act on these allegations of harassment. *DeGrace*, 614 F.2d at 803.[7]

Hancock's statement to Ross that Hancock would only refer Denton for work over his "dead body" is additional, compelling evidence of Local 29's continuing intent to discriminate against Denton. Local 29 showed no legitimate reason to justify Hancock's statement.[8]

In the context of the foregoing, Local 29's purported reasons for denying Denton journeyman status in December, 1982, are not credible. As elaborated earlier, there is no record reflecting the alleged requirement that a member be working to apply to take the test to become a journeyman. Contrary to Local 29's contention, the International's constitution does not impose this purported requirement. Moreover, Denton was not working at the trade when he asked to take the test because of Local 29's prior and continuing discrimination against him. In addition, the test was, in essence, a formality since everyone passed. The union gave the test specially to a single white member who, like Denton, already had 4000 hours experience and would

have been disadvantaged when the 8000 hour requirement went into effect. Yet Local 29 claimed its established rules would not permit it to be administered again to Denton.

■ For all of these reasons, the court has found that Local 29's stated reason for denying Denton journeyman status in December, 1982, was merely a pretext and that racial discrimination actually animated that action in violation of Title VII.

### 2. *Statute of Limitations*

■ Defendant contends that aside from the merits of Denton's claim, none of the alleged discriminatory acts upon which the August 2, 1983 EEOC complaint was based occurred within the requisite time period and, therefore, the relief plaintiff seeks is barred. In a deferral state such as Massachusetts, a complainant must "file his charges [with the EEOC] within 240 days of the alleged discriminatory employment practice." *Mohasco Corp. v. Silver*, 447 U.S. 807, 814 n. 16, 100 S.Ct. 2486, 2491 n. 16, 65 L.Ed.2d 532. Therefore, as this court held in denying Local 29's motion for summary judgment on this issue, if the last act of alleged discrimination occurred prior to December 6, 1982, Denton's Title VII claims would be time-barred. *See Denton v. International Brotherhood of Boilermakers et al.*, C.A. 84–2760–W (D.Mass. January 28, 1986).

This court has found that Local 29's denial of plaintiff's request to take the qualifying exam by the letter of its attorney dated December 17, 1982, and by the International's letter relying on Local 29's position dated December 20, 1982, represented discrete acts of discrimination within the statutory period.

---

7. Similarly, the union may not justify later actions to exclude plaintiff and deny plaintiff employment opportunities on plaintiff's decision to leave Hodge. The evidence shows that plaintiff would have continued to work there but for the fear of continued harassment. *DeGrace*, 614 F.2d at 806.

8. Hancock denied making the statement. The court did not find this denial credible. Moreover, if Hancock made the statement in retaliation for plaintiff's legitimate complaints about discrimination, such action would also be unlawful. *See* 42 U.S.C. § 2000e–3(a).

The foregoing acts were also part of a continuing violation of plaintiff's employment rights over several years. The First Circuit has addressed the continuing violation basis of liability as follows:

If the discrimination alleged is a single act, the statute begins to run at the time of the act. If, on the other hand, the statutory violation does not occur at a single moment but in a series of separate acts and if the same alleged violation was committed at the time of each act, then the limitations period begins anew with each violation and only those violations preceding the filing of the complaint by the full limitations period are foreclosed. Similarly, if the statutory violation occurs as a result of a continuing policy, itself illegal, then the statute does not foreclose an action aimed at the company's enforcement of the policy within the limitations period.

*Velazquez v. Chardon,* 736 F.2d 831, 833 (1984) (quoting *Perez v. Laredo Junior College,* 706 F.2d 731, 733–34 (5th Cir. 1983), *cert. denied,* 464 U.S. 1042, 104 S.Ct. 708, 79 L.Ed.2d 172 (1984)). In *Velazquez,* the court went on to state that "[a] party who wishes to show that he had been a victim of a continuing violation must demonstrate 'that not only the injury but the discrimination is in fact ongoing.'" *Valezquez,* 736 F.2d at 833 (quoting *Goldman v. Sears, Roebuck & Co.,* 607 F.2d 1014, 1018 (1st Cir.1979), *cert. denied,* 445 U.S. 929, 100 S.Ct. 1317, 63 L.Ed.2d 762 (1980)). *See also Delaware State College v. Ricks,* 449 U.S. 250, 257–8, 101 S.Ct. 498, 503–04, 66 L.Ed.2d 431 (1980); *United Airlines v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977). On this question, the First Circuit has held that following a discriminatory salary determination, each pay check represents a continuous violation of Title VII. *See Lamphere v. Brown University,* 685 F.2d 743, 747 (1st Cir.1982). In this case, to the extent that

Denton's claim establishes a continuing violation, it is not time-barred because he has shown that a discrete act of discrimination occurred within the statutory period.

**B.** *Remedies*

**1.** *Damages*

■ As Denton has established both discrete and continuing violations of Title VII he is entitled to equitable relief and attorney's fees. 42 U.S.C. § 2000e–5(g); 42 U.S.C. § 2000e–5(k); *Albermarle Paper Co. v. Moody,* 422 U.S. 405, 421–22, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975). Denton has not requested reinstatement in Local 29 as a field construction journeyman and the court agrees that it would be impossible as a practical matter to order reinstatement because of the history of dealings between the parties. *See Wildman v. Lerner Stores Corp.,* 771 F.2d 605, 614–16 (1st Cir.1985).

Accordingly, equitable relief should include compensation for the lost wages caused by Local 29's discriminatory denial of journeyman status in December, 1982. *Albermarle Paper Co.,* 422 U.S. at 421–22, 95 S.Ct. at 2373. Equitable relief should also include any lost wages caused by Local 29's continuing violation of Title VII in the two years prior to the filing of the EEOC complaint on August 2, 1983. *See* 42 U.S.C. § 2000e–5(g). ("Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the [EEOC].")[9] In addition, monetary relief in lieu of future reinstatement may be appropriate. *Wildman,* 771 F.2d at 616.

Any monetary award must also take into account Denton's duty to mitigate his damages, 42 U.S.C. § 2000e–5(g), and actual earnings Denton could not have achieved if he had been working as a welder. *See Whatley v. Skaggs Companies,* 508 F.Supp. 302 (D.Colo.1981), *affirmed in pertinent part,* 707 F.2d 1129, 1137 (10th Cir.),

---

**9.** Defendant argues that the earlier EEOC complaints bar plaintiff from recovering for acts prior to the dates those actions were brought. The EEOC complaint upon which this action was brought is dated August 2, 1983. The previ-

ous EEOC complaint was brought by plaintiff on August 4, 1981. The court finds that as a practical and equitable matter it is appropriate to calculate the back pay award from August 4, 1981.

*cert. denied*, 464 U.S. 938, 104 S.Ct. 349, 78 L.Ed.2d 314 (1983).

Although some evidence bearing on these issues was presented at trial, they have not been adequately briefed or argued. As judgment in this case must, in any event, be delayed to resolve the issue of attorneys' fees, the court requests that the parties confer with a view to attempting to agree on figures for the various components of monetary relief and, if that is unsuccessful, further brief the issues relating to remedies. Such briefs, if necessary, should address whether further evidentiary proceedings are requested with regard to remedies. *See Whatley*, 508 F.Supp. at 303.

### 2. *Attorneys' Fees*

Plaintiff is entitled to reasonable attorneys' fees as the prevailing party in a civil action to enforce the provisions of Title VII. *See* 42 U.S.C. § 2000e–5(k). Once again, it would be desirable if the parties could agree on an appropriate figure. They should confer with a view to doing so. If this effort is unsuccessful, the parties shall comply with the Procedural Order of this date concerning attorneys' fees. In either event, consideration of this court's decision on attorneys' fees in the case of *Rogers v. Motta*, C.A. 83–1045–W (D.Mass. January 21, 1986), may be helpful.

### III. CONCLUSION

For the reasons stated above it is hereby ORDERED that judgment shall enter for the plaintiff on his claims under Title VII, 42 U.S.C. § 2000e–5 *et seq.*

It is further ORDERED that the parties confer within twenty days following the date of this Memorandum and Order in an attempt to reach agreement, consistent with this opinion, on the proper amount of a monetary award. The parties shall also confer in an attempt to reach agreement on the amount of reasonable attorney's fees. If agreements cannot be reached, the court will schedule further proceedings on any unresolved issues. Judgment shall not enter until the issues of monetary relief and reasonable attorneys' fees are decided.

### PROCEDURAL ORDER

If the parties fail to reach agreement on attorneys' fees, the court hereby orders that the parties comply with the following procedural requirements in conjunction with an application for attorneys' fees.

A. Plaintiff shall by October 10, 1986, make a submission including the following:

1. Plaintiff shall file a tally of hours spent on this case by Attorney Paul L. Nevins and Attorney Philip R. Olenick.

2. Plaintiff shall file copies of contemporaneous billing records to supplement and support the tally of hours submitted.

3. To the maximum extent possible, plaintiff shall segregate the time spent by Attorney Nevins and Attorney Olenick on the separate claims brought in this action and on claims against the different defendants.

4. Plaintiff shall submit evidence of Attorney Nevin's and Attorney Olenick's customary fees for the years 1984, 1985, and 1986, the years in which the underlying action was being litigated. In addition, plaintiff shall submit further explanation of the percentage of Attorney Niven's and Attorney Olenick's caseload since 1984 that has been billed on a contingency basis and the percentage that has been billed on an hourly fee basis.

5. If plaintiff's attorneys assert that they have tried other Title VII actions, plaintiff shall submit the following information about those cases:

   a. the terms of Attorney Niven's and/or Attorney Olenick's fee agreement;

   b. the nature and disposition of the cases; and

   c. the amount of attorney's fees recovered, if any, with any opinions rendered on that issue.

B. Defendant shall respond to plaintiff's application for award of attorney's fees by October 24, 1986. Defendant is specifically invited to address the propriety of the hourly rates and hours requested in

plaintiff's application and to reference other Title VII cases where appropriate. Defendant is further invited to advise the court whether plaintiff's application should be considered as a complete or partial victory case. *See Hensley v. Eckerhardt,* 461 U.S. 424, 435–37, 103 S.Ct. 1933, 1940–41, 76 L.Ed.2d 40 (1983); *Lamphere v. Brown University,* 610 F.2d 46, 47 (1st Cir.1979); *Nadeau v. Helgemoe,* 581 F.2d 275, 278–79 (1st Cir.1978).