**Horace DENTON, Plaintiff,**

v.

**BOILERMAKERS LOCAL 29,**
**Defendant.**

Civ. A. No. 84–2760–WF.

United States District Court,
D. Massachusetts.

Oct. 1, 1987.

**40**

Paul L. Nevins, Philip R. Olenick, Boston, Mass., for plaintiff.

Paul F. Kelly, Segal, Roitman & Coleman, Boston, Mass., Steve A.J. Bukaty, Blake & Uhlig, Kansas City, Kan., for defendant.

## MEMORANDUM AND ORDER

WOLF, District Judge.

On September 5, 1986, this court found that the defendant Boilermakers Local 29 discriminated against the plaintiff Horace Denton on account of his race in violation of Title VII, 42 U.S.C. § 2000e et seq. *Denton v. Boilermakers*, 650 F.Supp. 1151 (D.Mass.1986). In connection with this determination, the court also found that reinstatement is impracticable because of the hostility between the parties. *Id.* at 1162. The court directed the parties to try to reach agreement with respect to damages and attorney's fees. On February 9, 1987, the court met with the parties and it was agreed that an evidentiary hearing was necessary to supplement the record to determine damages. The hearing was held June 10, 1987. Additional briefing was required after the hearing.

Upon consideration of the evidence and arguments presented, the court has decided to order an award of (1) back pay in the amount of $52,776.78; (2) prejudgment interest in the amount of $12,138.48; (3) attorney's fees to Paul Nevins in the amount of $18,225 and to Phillip Olenick in the amount of $15,600. Front pay is not justified in this case.

### I. DAMAGES

#### A. *The Generally Applicable Standards*

The appropriate remedy for violation of Title VII is a matter of discretion for the court. Section 2000e–5(g) of 42 U.S.C. provides that "the court may ... order such affirmative action as may be appropriate, which may include, but is not limited to reinstatement or hiring of employees, with or without back pay.... Interim earnings or amounts earnable with reasonable diligence by the person ... discriminated against shall operate to reduce the back pay otherwise allowable." The objective is "to make the victims of unlawful discrimination whole by restoring them, so far as possible to a position where they would have been were it not for the unlawful discrimination." *Ford Motor Co. v. EEOC,*

458 U.S. 219, 230, 102 S.Ct. 3057, 3065, 73 L.Ed.2d 721 (1982).

The Supreme Court has emphasized that the "court must exercise this [discretionary] power 'in light of the larger objectives of the Act.' " *Ford*, 458 U.S. at 226, 102 S.Ct. at 3063. Lower courts have interpreted this requirement to indicate that while back wages are not to be automatically given, they should "normally be awarded unless special circumstances are present." *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 253 (5th Cir.1973).

■ The plaintiff has the initial burden of proving the defendant owes him back pay. *Durden v. Bouligny*, 22 F.E.P. 1455, 1459 (N.D.Fl.1979). "This requires positive proof that plaintiff was ordinarily entitled to the wages in question and, being without fault, would have received them in the ordinary course of things but for the inequitable conduct of the party from whom the wages are claimed." *Jinks v. Mays*, 464 F.2d 1223, 1226 (5th Cir.1972). The burden is one of "just and reasonable inference." *Kolb v. Goldring*, 694 F.2d 869, 874 (1st Cir.1982). With regard to the issue of the amount of back pay to be awarded, "[i]t is sufficient if a reasonable basis of computation was afforded, although the result be only approximate." *Id.*

"Once the gross amount of back pay owed plaintiff has been determined, the burden shifts to the defendant to prove what should be deducted therefrom as 'interim earnings or amounts earnable with reasonable diligence.' " *E.E.O.C. v. Kallir*, 420 F.Supp. 919, 924 (S.D.N.Y.1976) *aff'd without op.* 559 F.2d 1203 (2d Cir. 1977) *cert. denied*, 434 U.S. 920, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977); *Thurber v. Jack Reilly's*, 521 F.Supp. 238, 240–42 (D.Mass.1981), *aff'd*, 717 F.2d 633 (1st Cir. 1983) *cert. denied*, 466 U.S. 904, 104 S.Ct. 1678, 80 L.Ed.2d 153 (1984); ("It is well established that the wilfull loss of earnings is an affirmative defense and the burden of proving it rests with the employer.").

■ In addition, as a general rule, "where one's conduct has prevented a precise computation of damages, the injured party is not to be deprived of adequate damages. The trier of fact may draw reasonable inferences from relevant facts, and all doubts are to be resolved in favor of the injured party; the wrongdoer does not become the beneficiary of his own wrongful conduct." *Kallir*, 420 F.Supp. at 923. *See also Thurber*, 521 F.Supp. at 242; *Goss v. Exxon Office Systems*, 747 F.2d 885, 889 (3rd Cir.1984) ("The risk of lack of certainty with respect to projections of lost income must be borne by the wrongdoer not the victim."); *Durden*, 22 F.E.P. at 1460 ("Exact mathematical certainty, though, is not required when computing a back pay award, and 'uncertainties in determining what an employee would have earned but for the discrimination should be resolved against the discriminating employer.' ").

■ The court has the discretion to award prejudgment interest on a back pay award if it is necessary to make the plaintiff whole. *See e.g., Conway v. Electro–Switch Corp.*, 825 F.2d 593, 602 (1st Cir. 1987).

■ Front pay—that is pay for economic damages likely to be sustained in the future as a result of discrimination—is to be awarded if reinstatement is not feasible and such a monetary award is neccesary to assure that the "plaintiff is returned as nearly as possible to the economic situation s/he would have enjoyed but for the illegal [discrimination]." *Wildman v. Lerner Stores*, 771 F.2d 605, 615 (1st Cir.1985).

### B. *Back Pay: Plaintiff's Initial Burden*

#### 1. *Average Earnings*

In its September 5, 1986 Order this court found it appropriate to calculate back pay from August 4, 1981. *Denton*, 650 F.Supp. at 1162 n. 9. The parties have agreed to use as a comparison group for back pay calculation similarly situated boilermaker journeymen listed in Trial Exhibit 30. *See* Trial Transcript, Vol. IV, p. 40. These boilermakers and Denton had each accumulated 4000 hours of experience prior to the Fall of 1982 when all but Denton were granted journeyman status.

42

■ In determining the appropriate back pay, the court must first decide whether the proper measure of back pay is what the average boilermaker in the comparison group earned during the relevant time period, or what the highest paid member of the comparison group earned. At the hearing held on February 9, 1987, the plaintiff's attorney suggested that the court use "some average of salaries to compute backpay." Transcript of February 9, 1987 Hearing at 4. Nevertheless, the plaintiff subsequently asked the court to use the highest salary of anyone in the comparison group because, it is claimed, the plaintiff is "very diligent and industrious." Plaintiff's June 19, 1987 Submission on Damages and Fees at 2. The court concludes that the average boilermaker in the comparison group provides the proper standard in this case.

In *Johnson v. Ryder Truck Lines*, 30 F.E.P. 659 (W.D.N.C.1980) [Available on WESTLAW, 1980 WL 215], the district court was presented with a similar question. The court stated, "[a]lthough, given the discretion allowed extra board drivers to work as hard as they wish, it is possible that some or all of the plaintiffs might have earned more than the average earnings of extra board drivers, I believe that the average extra board earnings will provide the best measurement of what a driver most likely would have earned at Ryder during the pertinent time period." *Id.* at 668. *See also Durden v. Bouligny*, 22 F.E.P. 1455, 1459 (N.D.Fla.1979). The same conclusion is appropriate here. While the evidence at trial showed Denton was a good worker, it did not indicate he was the hardest worker. Thus, the average similarly situated boilermaker provides the proper comparison.

Also in dispute is whether the average hours in the comparison group are misleading because some of the people included were not "actively working" as boilermakers during the time period. *See Johnson,*

30 F.E.P. at 665. The plaintiff contests the inclusion of four individuals. The defendant represents that one of the four, Depesa, was not included in the comparison group. Letter from Paul Kelly to the court (April 16, 1987). No evidence was presented by the plaintiff to suggest that any of the other three individuals were not actively working as boilermakers. The court therefore includes those three men in the comparison group.

### 2. *Fringe Benefits*

■ The court must also consider whether it is within its discretion to include fringe benefits in the calculations, and if so, which benefits. At issue are pension fund payments and annuity fund payments. At the evidentiary hearing on June 10, 1987, the parties agreed that health benefits were not at issue.

The court finds it has the discretion to include pension benefits in the calculation, and does so. *See Syvock v. Milwaukee Boiler Mfg. Co.*, 665 F.2d 149, 161 (7th Cir.1981); *Kallir*, 420 F.Supp. 919, 924 (S.D.N.Y.1976). *See also Loeb v. Textron*, 600 F.2d 1003, 1021 (1st Cir.1979) (court found pension benefits recoverable under the ADEA). In addition, the annuity benefits fund should be included if Denton is to be fully compensated for the damage caused by defendant's discrimination. *See e.g. Vant Hul v. City of Dell Rapids*, 465 F.Supp. 1231, 1233 (D.S.D.1979); *Love v. Pullman Co.*, 13 F.E.P. 423, 426 (D.Colo. 1976) [Available on WESTLAW, 1976 WL 620]; Larson, *Employment Discrimination* at 55.37(b)(ii); Special Project, Back Pay in Employment Cases, 35 Vand.L.Rev. 893, 1005-7 (1982). The court realizes, however, that the annuity fund was not instituted until October 1985.

### 3. *Damage Chart*

Given these conclusions, the following chart reflects a breakdown of the comparison groups' earnings:

1. AVERAGE EARNINGS OF CONTROL–GROUP BOILERMAKER AUGUST, 1981 THROUGH SEPTEMBER, 1986:

August, 1981 through September, 1981: $ 4,920.00;
October, 1981 through September, 1982: $20,700.00;
October, 1982 through September, 1983: $25,565.00;
October, 1983 through September, 1984: $25,085.00;
October, 1984 through September, 1985: $21,280.00;
October, 1985 through September, 1986: $11,652.00.

2. PENSION BENEFITS CONTRIBUTED FOR THE PERIOD AUGUST, 1981 THROUGH SEPTEMBER, 1986:

August, 1981 through September, 1981: $ 492.00;
October, 1981 through September, 1982: $ 2,070.00;
October, 1982 through September, 1983: $ 2,056.50;
October, 1983 through September, 1984: $ 2,508.50;
October, 1984 through September, 1985: $ 2,128.00;
October, 1985 through September, 1986: $ 1,165.20.

3. ANNUITY BENEFITS October, 1985 THROUGH SEPTEMBER, 1986: 45¢ per hour × 615.375 (average hours worked) = $277.00

4. AVERAGE WAGES INCLUDING PENSION AND ANNUITY BENEFITS:

August, 1981 through September, 1981: $ 5,412.00;
October, 1981 through September, 1982: $22,770.00;
October, 1982 through September, 1983: $22,621.50;
October, 1983 through September, 1984: $27,593.50;
October, 1984 through September, 1985: $23,408.00;
October, 1985 through September, 1986: $13,122.03;
Estimated Earnings September 1986 to
January 1, 1987: $ 5073.61[1]

See generally Defendant's Damage Submission. See also Letter from defendant's counsel Paul Kelly to the court (June 19, 1987) ("In view of the rather de minimus nature of the discrepancy [between plaintiffs and defendant regarding the calculation of average wages], we have not pursued the arithmetic to determine where the differences lie."); Plaintiff's Further Submission on Damages and Fees Exhibit C.

The total earnings of the average boilermaker in the comparison group, including benefits, from August 4, 1981 to January 1, 1987 is $119,999.78.

### C. Mitigation of Damages

Under Title VII "[i]nterim earnings or amounts earnable with reasonable diligence by the persons discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000e–5(g). During the relevant time period, Denton engaged in a number of activities to earn money and thereby mitigate his damages. He sought work at defendant's hiring hall, the Massachusetts Employment Center, the Third World Clearinghouse, and at least one other employment agency. In addition, he and his family bought and rehabilitated a building, which Denton now owns. The extent of Denton's role in the building's rehabilitation is, however, contested. The building includes an ice cream store which Denton manages. The rest of the building is rented to other businesses.

The record also indicates that there are certain steps Denton would not take to mitigate his damages. As he testified at his deposition, Denton would not consider returning to certain non-union jobs he had previously held because the wages were too low. This decision apparently extended to any job "lower" than the boilermaker's position of which he was deprived by defendant's discriminatory acts. Denton Dep. at 12. Thus, during the relevant time

1. The total earnings through September 1986 are $114,926.17. The defendant provided an estimated projected earnings from September 1986 through June 1987 of $15,220.83. The Court, however, finds that back pay ends on January 1, 1987. See Conclusions of Law. The court therefore divides the estimated earnings from September 1986 through June 1987 by three to approximate what the average boilermaker would have earned from September 1986 through January 1, 1987. This is how the court arrives at the figure $5073.61.

period Denton was (1) looking for work, but only if the work was not "lower" than the job he was fired from and (2) starting his own business.

As described below, the court finds that the combination of looking for work and starting a business generally satisfied Denton's obligation to mitigate his damages with reasonable diligence. The court also finds, however, that during the period of time when the building was being rehabilitated, Denton either did not exercise reasonable diligence or he worked on that rehabilitation, for which earnings should be imputed. In addition, the court concludes that the ice cream store generated interim earnings that must be deducted from the back pay award.

### 1. *Job Search*

As Denton testified, from August 1981 to March 1983, he was essentially looking for work, but did not find a job. As the court stated in *Whatley v. Skaggs Co.*, 707 F.2d 1129, 1138 (10th Cir.1983) *cert. denied* 464 U.S. 938, 104 S.Ct. 349, 78 L.Ed.2d 314 (1983) however, "mitigation requires not success in finding alternative employment, but only a reasonable exertion to mitigate damages." *See also N.L.R.B. v. Arduini Man. Co.*, 394 F.2d 420, 423 (1st Cir.1968) ("He is held, however, only to reasonable exertions in this regard, not the highest standard of diligence.").

 Denton's job search consisted of the following. Until September 6, 1984, he periodically visited defendant's hiring hall to look for work. This was unavailing. After September, 1984, it was reasonable for Denton to conclude that further inquiries with the Boilermakers would be futile. *See Walston v. School Bd.*, 566 F.2d 1201, 1206 (4th Cir.1977); *United States v. Wood Wire & Metal Lathers Int'l Union*, 328 F.Supp. 429 (S.D.N.Y.1971); Special Project, *supra*, 35 Vand.L.Rev. at 1020. He also sought work about every other week at the Massachusetts Employment Center, the Third World Clearinghouse and at least one other employment agency.

Denton did not, however, seek work at Hershey Products in Dedham, Massachusetts or Westinghouse Electric in Readville, Massachusetts, two non-union shops in which he had worked in the past. In his deposition the subject was addressed as follows:

Q. Did you ever go back to Westinghouse?

A. Never gone back to Westinghouse, because the wages were too cheap there. I had too many dependents.

Q. Do you know what the wages at Westinghouse were?

A. Probably in the '80s, probably about $9–10 hour.

Q. Did you go back there [to Hershey].

A. No.

Q. Was it the same reason?

A. Yes, wages was too small. That's when I came off the ship, never nothing better.

Q. What was the wages at Hershey?

A. Well, I guess my job wasn't there any more. They had found a better way for the machine castings, because they used to come out as forms with holes and then we'd fill the holes; but then that job was not there no longer, because I got friends that work there.

Q. Did you ... also have friends at Westinghouse?

A. Yes.

Q. And that's how you found out what the wages at Westinghouse were?

A. Westinghouse wasn't doing the kind of business they used to do in the early '70s no more. They were laying off guys too.

Q. But $9 an hour was not an adequate wage rate?

A. $9 an hour cannot feed a wife and five kids, can it, and a house.

Denton Dep. at 10–11.

In his deposition testimony, Denton indicated that his refusal to consider less lucrative jobs was not limited to Hershey and Westinghouse:

Q. After you sold your cab, in 1979 and after you left Hodge Boilerworks in 1979, how did you support your family?

A. Support my family from my wife. My wife works. And I had the money

that I sold the taxi for. Plus, I had my family members help me, because I wasn't going to stay in the street and take a job lower than what I used to do. I wasn't going to stay in the street and take a job lower.

*Id.* at 12.

Nevertheless, Denton's job search is comparable to similar efforts which have been found to be reasonably diligent. *Helbling v. Unclaimed Salvage*, 489 F.Supp. 956, 964 (E.D.Pa.1980) ("A person who is 'sincere about obtaining employment' can be expected to check want ads, register with employment agencies, and discuss potential opportunities with friends...."); *Sprogis v. United Air Lines*, 517 F.2d 387, 392 (7th Cir.1975). His job search appears distinguishable from those searches found to be inadequate. *See Durden*, 22 F.E.P. at 1460 ("She could not recall applying to or registering with an employment agency"); *N.L.R.B. v. Arduini Man. Co.*, 394 F.2d 420, 423 (1st Cir.1968) (shortage of people with plaintiff's skills in city where he had worked for twelve years, but he never looked for work there or read want ads in the newspapers).

■ Moreover, the court finds that Denton's refusal to consider work at Westinghouse and Hershey Products does not constitute a failure to mitigate damages. The Supreme Court has stated that, "[a]lthough the unemployed or underemployed claimant need not go into another line of work, accept a demotion, or take a demeaning position, he forfeits his right to back pay if he refuses a job substantially equivalent to the one he was denied." *Ford Motor Co. v. EEOC*, 458 U.S. 219, 232, 102 S.Ct. 3057, 3066, 73 L.Ed.2d 72 (1981). In formulating this standard, the Supreme Court relied on a First Circuit case, *N.L.R.B. v. Arduini Man. Co.*, 394 F.2d at 423, in which an employee was found to have failed to mitigate his damages, at least in part because he declined a job for slightly higher pay but with no fringe benefits. In addition, other cases suggest that under certain circumstances, particularly after a long period of unemployment, a decision to refuse to accept any lower paying job, such as Denton's categorical decision, might constitute a failure to mitigate damages.[2]

However, the defendant has the burden of proving a failure to mitigate. In this case the defendant has not shown that jobs existed at Westinghouse or Hershey during the relevant time period, and even if they did exist, that they were substantially equivalent to the boilermaker position of which Denton was improperly deprived. The defendant has failed to meet its burden of proof. Thus, the fact that Denton did not work at Westinghouse or Hershey does not constitute a failure to mitigate damages. Nor does his categorical refusal to accept a "lower" job.

### 2. Self-Employment

■ In late 1981, Denton's family purchased a building with his mother's money. Denton Dep. at 14, 16. Denton is the owner of the building. Substantial rehabilitation of the building was required. A new roof, floor and a brick facade were added. Electrical service and plumbing were installed. The rehabilitation took place over a period of years. Denton initially claimed a contractor did the work, but later acknowledged that the contractors were "family members, friends of the family." Denton Dep. at 18. Denton maintains that his only involvement was to purchase sup-

---

2. The case law suggests an approach to mitigation that takes into account the time the plaintiff has spent looking for alternative employment. *See Ford*, 458 U.S. at 231–233 n. 16, 102 S.Ct. at 3065 n. 16. ("Some lower courts have indicated, however, that after an extended period of time searching for work without success, a claimant must consider taking a lower-paying position."). *See also*, Itzkoff, *Dealing With Damages* 305 (1983). At first, the employee need only accept "virtually identical promotion opportunities, compensation, job responsibilities and working conditions and status." *Rasi-*

*mas v. Michigan Dep't of Mental Health*, 714 F.2d 614, 624 (6th Cir.1983), *cert. denied*, 466 U.S. 950, 104 S.Ct. 2151, 80 L.Ed.2d 537 (1984); Schlei and Grossman, *Employment Discrimination Law* (1983–84 supplement) at 286. But a "discriminatee may be required by the Labor Board to 'lower his sights' by seeking less renumerative work after he ... unsuccessfully attempted for a reasonable period of time to locate interim employment...." *N.L.R.B. v. Madison Courier*, 472 F.2d 1307 (D.C.Cir.1972). *But see EEOC v. Pacific Press*, 482 F.Supp. 1291 (N.D.Cal.1979).

plies for the rehabilitation. *Id.* at 18. The defendant, however, contends that this is not credible and that the court should infer that Denton, as an experienced but unemployed member of the building trade, worked on the building. Defendant's Supplemental Proposed Findings of Fact and Conclusions of Law at ¶ 47.

The court is persuaded by defendant's assertions on this point. Denton did not have a job between late 1981 when the building was acquired and March, 1983 when the ice cream store opened. If, as Denton claims, his family did the rehabilitation, the court concludes that Denton himself made a meaningful contribution to this. If the court did not infer that Denton was working on the rehabilitation in this period, the conclusion that he was reasonably diligent in mitigating the loss caused by defendant's conduct would be qualified. Thus, the court finds that earnings should be imputed for Denton's work on the building; if this were not done, a comparable reduction in damages for failure to make an adequate effort to seek work would be appropriate.

The court must infer an appropriate figure for the rehabilitation work because it finds that Denton has not provided accurate information concerning his work on the building. The court therefore imputes $5000—representing $10 an hour for 500 hours—as the value of Denton's efforts. Ten dollars an hour is the value of the employment opportunity Denton said he would forego in favor of self-employment. *See* Denton Dep. at 11–12. *See also* Defendant's Damage Submission at 3. Five Hundred hours is an approximation which reflects the fact that the project was done off and on, depending on whether money was available. *See* Denton Dep. at 5. If Denton did no work on the building as he claims, a reduction of $5000 in the back pay award would be appropriate for his failure to mitigate damages properly after a prolonged period of unemployment.

The ice cream store opened in a rehabilitated part of a building in 1983. As the rehabilitation continued, space was leased to other businesses. The building provided room for six stores. Denton and his sister had primary responsibility for the ice cream store. The store was open from 10:00 in the morning until 11:00 at night seven days a week. At his deposition, Denton said "I stayed there in the morning. My sister stayed there in the afternoon, but we still have other members help. If I want to do something I go anyway. I could always ask somebody to come and stay." Denton Dep. at 35. The court finds that while Denton's hours were somewhat irregular, he had what amounts to a full time job operating the ice cream store beginning in March, 1983.

Once Denton started operating the ice cream store he had satisfied his duty to mitigate. "It is indisputable that self-employment is an adequate and proper way for an injured employee to attempt to mitigate his loss of wages." *Heinrich Motors v. NLRB*, 403 F.2d 145, 148 (2d Cir.1968). Self employment plus seeking employment can also be adequate. The instant case is therefore similar to *National Labor Relations Board v. Cashman*, 223 F.2d 832 (1st Cir.1955), a case in which two discharged employees undertook without success to operate an automobile business of their own instead of devoting all their time to seeking new employment of the same type as they had before. As the First Circuit held:

> There is no essential incompatibility between operating a business of one's own while at the same time seeking employment as these men did. Their business was small and their customers few and sporadic so they did not necessarily doom their business to failure because sometimes one went job hunting while the other ran the business, or because sometimes they closed their shop and both went out to seek employment. The most that can be said is that their judgment was poor in not putting in full time at their repair shop, or that their managerial and bookkeeping skills were so undeveloped that it was poor judgment for them to have undertaken their business venture at all. But the principle of mitigation of damages does not require suc-

cess; it only requires an honest good faith effort....

*Id.* at 836.

In the case at bar, there was also no incompatibility between operating a business and seeking employment. Denton could get someone to cover for him when he went to the hiring hall or other employment agencies. In addition, seeking employment did not doom the business to failure. The ice cream store was kept open thirteen hours a day, seven days a week, and Denton put in a full shift himself. The difficulty Denton faced acquiring "substantially equivalent" employment helps explain and justify the reasonableness of his decision to seek self-employment. Because of the discrimination by the union he was excluded from the hiring hall through which union jobs were assigned. Thus, for Denton to attain substantially equivalent employment required some initiative and creativity on his part. *See generally, Ryan v. Raytheon Data Systems,* 601 F.Supp. 243, 253 (D.Mass.1984) (employee who "was justifiably concerned that she would not get positive recommendations from her employers" acted reasonably by going to school in the evenings to enhance employability). *McCormick on Damages,* 630 (1935) ("Only a reasonable effort to minimize ... loss is demanded, and it may be reasonable for the employee to go into business for himself, at least if no employment is available, even though the enterprise later turns out to be unprofitable.").

In the instant case, Denton combined a search for equivalent employment with starting his own business and this combination of activities satisfied his obligations.

### D. *Interim Earnings*

As indicated earlier, "[i]nterim earnings or amounts earnable with reasonable diligence by the persons discriminated against ... operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000–5(g). Defendant contends that the income Denton earned in the ice cream store constitutes interim earnings that should be deducted from a back pay award. Denton claims that income should not be deducted, because he could have held the "supplemental job and his desired full-time job simultaneously and there is reason to believe he [would] do so." *Bing v. Roadway Express,* 485 F.2d 441, 454 (5th Cir.1973). *See also Whatley v. Skaggs Co.,* 707 F.2d 1129, 1139 n. 10 (10th Cir.1983), *cert. denied,* 464 U.S. 938, 104 S.Ct. 349, 78 L.Ed. 2d 314 (1983). The court finds that the defendant's contention is correct.

The courts have found earnings not to be deductible when they are earned during time periods where the plaintiff clearly would not be working at the job he lost. For example in *Behlar v. Smith,* 719 F.2d 950, 954 (8th Cir.1983), *cert. denied,* 466 U.S. 958, 104 S.Ct. 2169, 80 L.Ed.2d 552 (1984), the court found a faculty member's earnings in the summer and evenings during the school term should not be offset.

Where there is real or potential time overlap, however, the courts have been less willing to find the earnings to be non-deductible. For example, in *Whatley v. Skaggs,* 508 F.Supp. 302 (D.Col.1981), *aff'd in part,* 707 F.2d 1129 (10th Cir.1982), the Court of Appeals affirmed the trial court's offset of certain earnings because the plaintiff would not have been able to do the work at issue if he had not lost his job, in which he was working more than ten hours a day, seven days a week. The trial court in *Whatley* had also found that certain other earnings should not be offset. The employer there could not offset self-employment earnings that the plaintiff earned helping his wife run her business because "[t]hese earnings reflect work he easily could have performed in spare time, on an occasional basis, to help the family business." 508 F.Supp. at 304.[3] Apparently,

---

3. The fact that the interim employment is self-employment is not material. *McCluney v. Jos. Schlitz Brewing Co.,* 540 F.Supp. 1100, 1103 (E.D.Wis.1982), *aff'd* 728 F.2d 924 (1984). *See generally, NLRB v. Cashman,* 223 F.2d 832 (1st Cir.1955) (self-employment earnings deducted);

*Heinrich Motors Inc. v. N.L.R.B.,* 403 F.2d 145, 148 (2d Cir.1968) ("Self-employment should be treated like any other interim employment in measuring backpay liability."). *Peel v. Florida,* 500 F.Supp. 526, 528 (N.D.Fla.1980). *McCormick on Damages* at 630 ("If such a business is

the issue of self-employment earnings was not raised on appeal.

■ Although the instant case involves self-employment in a family business and somewhat flexible hours, it is not a case in which Denton was working in his spare time or on an occasional basis. The ice cream store opened in March of 1983. Although Denton's hours were irregular, he had what amounted to a full time job there. Denton could therefore not have performed his functions in the ice cream store as well as the job he lost because of discrimination. Thus, the job in the ice cream store constitutes interim employment. The value of this employment must be offset against the back pay award.[4]

■ The earnings from the commercial rentals in the rehabilitated building, however, are not interim earnings. If Denton were now rehired as a boilermaker, he could continue to be a landlord and would do so. *See Bing v. Roadway Express*, 485 F.2d 441, 454 (5th Cir.1973). He could perform his responsibilities as a landlord in his spare time. *See Whatley*, 508 F.Supp. at 303. Itzkoff, *Dealing with Damages* at 305–6 ("[I]ncome from a second job or from investments will be excluded, unless the defendant can establish that this income could not have been earned had the plaintiff also worked for the defendant."). *See generally, United States v. City of Socorro*, 25 F.E.P. 815, 825 (D.N.M.1976) [Available on WESTLAW, DCT database]. Thus, the rental income earned by Denton does not diminish the award to which he is entitled.

Because operation of the ice cream store constitutes interim employment, but the commercial rentals are supplemental employment, the court must distinguish between what Denton earned and deducted at the ice cream store and what he earned and deducted from the commercial rentals. Denton's tax returns, however, confuse the two. The court's task is further complicated by Denton's failure to keep proper records at the store. Denton took his salary in cash, however, at the hearing on June 10, 1987, he indicated that the records of the cash disbursements had been thrown out and were therefore never properly marked in the store's books. Denton asks that the court rely on his tax returns alone. In response, the defendant contends that those returns do not reflect all of Denton's income from the ice cream store. Although this is a close question, the court does not, on the record before it, conclude that Denton filed false tax returns. Thus, Denton's tax returns may be used to determine interim earnings.

Relying on those tax returns, the court finds Denton's earnings to be as follows. In 1981, he earned nothing. He also earned nothing in 1982. In 1983, Denton earned a profit of $5,703 from the ice cream store. The plaintiff contends that $655 should be deducted from the $5,703 profit as a loss relating to the commercial rentals. The defendant contests this deduction. The court finds this expense relating to the rentals is not deductible. The defendant also contends the court should add to the profits $2,190 that the plaintiff deducted from his income for car and truck expenses. The defendant claims that expenses incurred in the rehabilitation of the building are not properly deductible from the ice cream store profits. In his deposition, Denton acknowledged that the car and truck expenses were for the rehabilitation of the building, not the ice cream shop. Denton Dep. at 44. The court finds that the $2,190 relates to the commercial rentals and is therefore not deductible. Thus, $2,190 must be added to the 1983 income.

preferable, and is one that could not have been carried on consistently with original employment, the profits will be subtracted from the lost wages in assessing damages.").

4. Once again, if Denton's work in the ice cream store is not interim employment, the court would not be satisfied with Denton's mitigation efforts after he started working at the store. The plaintiff would like the court to find that this is a supplemental job and that he also mitigated his damages. The court has found, however, that his work in the ice cream store supports the conclusion that he reasonably mitigated his damages at least during part of the relevant period. If this were just supplemental work for him, more mitigation efforts would be expected.

Denton's total interim earnings for 1983 are $7,893.

In 1984, Denton reported earning a profit of $1,624 from the ice cream store. He also reported earning a profit of $2,670 from the commercial rentals in the building. The defendant contends that the plaintiff improperly deducted $1,123 from his business income for insurance. The court finds the insurance covers the ice cream store and is therefore deductible. The defendant also contests $551 deducted from Denton's business income as legal fees attributable to a tenant dispute. *See* Denton Dep. at 48. This expense relates to the rentals and is not deductible. The defendant also contends that a deduction of $5,296 for utilities and telephone was exaggerated, because it is "far in excess of amounts deducted previously or since." Defendant's Damage Submission Appendix A at note 4. The court is not persuaded by this conclusory objection.

Also at issue is a $3,344 deduction for rent for the ice cream store. The defendant contends the rent from the ice cream store was not paid because it was not reported anywhere as income. Denton was both a tenant and the owner of the building. At one point in his deposition Denton said the ice cream store rent was paid to his mother. Denton Dep. at 50. At another point he said the rent went into rehabilitating the building. Dep. at 49. There appears to be no record of any rent payment. Dep. at 51. Thus, the court will not deduct the purported ice cream store rent. Therefore, Denton's total earnings for 1984 are $5,519.

In 1985, Denton reported earning a profit of $10,620 from the ice cream store and $5,530 from the commercial rentals.[5] The defendant contends Denton improperly deducted $2,390 for employee business expenses. *See* Denton's 1985 tax form 2106. *See also* Defendant's Damage Submission

Appendix note 6 (mistakenly listing the figure as $2,306). $2,140 of the employee business expenses were listed as travel expenses incurred away from home overnight. In his deposition, however, Denton said the expenses related to when he would "go around and pick stuff, gas, and all that." Denton Dep. at 57. He also could not remember being anywhere overnight in 1985. *Id.* Due to the lack of substantiation in the record, the court will not allow any of these deductions. The defendant also contends Denton improperly deducted $3,179 as car and truck expenses, $6,000 in legal fees for trouble with tenants, and $4,800 rent. The court will not deduct these expenses either. Thus, Denton's income for 1985 is $26,989.

In 1986, the plaintiff reported earning a profit of $11,382 from the ice cream store, but he erroneously claimed a loss of $1,208 from the commercial rentals. The defendant contends that Denton also improperly deducted $5,640 in legal fees and $4,800 in rent. The legal fees relate to a tenant dispute. The court finds that the ice cream store rent and legal fees should be added to the profits. Denton's total income for 1986 is $21,822.

### E. *Unemployment Compensation*

■ Another mitigation of damages issue relates to Denton's failure to collect unemployment compensation. The defendant contends that this failure indicates that Denton did not reasonably mitigate his damages. Defendant therefore requests that the unemployment benefits that Denton could have collected be be deducted from his back pay awards.

"[C]ourts continue to disagree on deducting unemployment compensation benefits from back pay awards" when the benefits were collected. Schlei and Grossman, *supra.* at 285–86. *See Ryan v. Ratheon Data Systems*, 601 F.Supp. 243, 254

---

5. The defendant claims that Denton's 1985 tax return is false. Defendant points to an unofficial tax return showing much higher income which was given to the defendant by Denton's attorney. According to Denton's attorney, "[u]pon discussion with the plaintiff and his tax preparer, it was discovered that the plaintiff has accidentally provided his attorney with worksheets which apparently had been confused with those of another client of the tax preparer." Opposition to Motion to Compel at ¶ 4. The court relies on the tax return Denton represents he filed.

(D.Mass.1984). The courts that do not deduct such benefits believe that recoupment by the state is "a preferable method of remedying any possible unfairness between the plaintiff and the state. On the other hand, some courts have offset unemployment benefits ... to avoid making the plaintiff 'more than whole.'" Schlei, *supra*, at 286. In this district, the court in *Thurber v. Jack Reilly's*, 521 F.Supp. 238, (D.Mass.1981) *aff'd*, 717 F.2d 633 (1st Cir. 1983) *cert. denied*, 466 U.S. 904, 104 S.Ct. 1678, 80 L.Ed.2d 153 (1984), decided to offset unemployment benefits to prevent a double recovery for the plaintiff. In *Ryan*, however, another judge in this district declined to deduct the amount of benefits received. *Ryan*, 601 F.Supp. at 254. The instant case does not require choosing between conflicting authority, however, because Denton did not collect unemployment benefits. Thus, there is no double recovery. The court, therefore, will not reduce the award of back pay by the amount of unemployment benefits which Denton might have, but did not, receive.

### F. Back Pay Period

As indicated earlier, the court has found it appropriate to calculate back pay from August 4, 1981. *See Denton*, 650 F.Supp. at 1162 n. 9. The question that remains is whether back pay will continue until judgment is entered or whether changes in the plaintiff's employment warrant ending the period for calculations of back pay at an earlier date. The court concludes that an earlier date, December 31, 1986, is appropriate.

Courts interpreting Title VII have terminated the back pay period when the defendant has acquired employment which is more lucrative than the job he lost. *Matthews v. A-1 Inc.*, 748 F.2d 975, 978 (5th Cir.1984); *Nordquist v. Uddeholm Corp.*, 615 F.Supp. 1191, 1204 (D.C.Conn.1985). *See also DiSalvo v. Chamber of Commerce*, 568 F.2d 593, 598 (8th Cir.1978); *Butta v. Arundel County*, 473 F.Supp. 83 (D.Md.1979); *Somers v. Aldine Indep. School*, 464 F.Supp. 900, 903 (S.D.Tex.1979) *aff'd without op.*, 620 F.2d 298 (5th Cir. 1980); *Milton v. Bell Laboratories, Inc.*,

428 F.Supp. 502 (D.N.J.1977); *Reid v. Memphis Publishing Co.*, 369 F.Supp. 684, 690–91 (W.D.Tenn.1973) *aff'd in part, rev'd in part*, 521 F.2d 512 (6th Cir.1975) *cert. denied*, 429 U.S. 964, 97 S.Ct. 394, 50 L.Ed.2d 333 (1976), Special Project, *supra*, 35 Vand.L.Rev. at 1029. This court is persuaded that by the end of 1986, the plaintiff had transformed his ice cream store into an established, successful business, more lucrative than his prior employment as a boilermaker would have then been. Thus, back pay terminates at the end of 1986.

In sum, Denton's Interim Earnings for the years in question are as follows:

| YEAR | EARNINGS |
| --- | --- |
| 1981 | 0 |
| 1982 | 0 |
| 1983 | $ 7,893 |
| 1984 | $ 5,519 |
| 1985 | $26,989 |
| 1986 | $21,822 |
| | $62,223 |

The total interim earnings from August 1981 through January 1, 1987 is therefore $62,223.

As the foregoing indicates, the relevant period for computing back pay in this case is August 4, 1981 to December 31, 1986. In that period the average boilermaker in the comparison group earned $119,999.78. In this period Denton earned $62,223. To this figure, $5000 should be added for Denton's work on the rehabilitation of the building. Therefore Denton's total earnings for the back pay period are $67,223. Computing the difference between the average comparison group earnings and Denton's earnings establishes that Denton is entitled to back pay in the amount of $52,-776.78.

### G. Prejudgment Interest

As described previously, awarding prejudgment interest in a Title VII case is within the discretion of the court. *See e.g. Conway v. Electro Switch Corp.*, 825 F.2d 593, 602 (1st Cir.1987); *Earnhardt v. Comm. of Puerto Rico*, 744 F.2d 1, 3 (1st Cir.1984).

The determination of the amount of damages is, absent legal error, a matter for the finder of fact. It cannot be said that prejudgment interest ... must, as a matter of law, be part of the damages awarded in the Title VII case. The question of whether [it] is necessary to make the plaintiff whole is within the discretion of the trial court.

*Electro Switch,* at 602 *quoting Earnhardt,* 744 F.2d at 3. In this case, an award of prejudgment interest is fair, reasonable and necessary to make the plaintiff whole. *Electro Switch,* at 602; Special Project, *supra,* 35 Vand.L.Rev. at 1007, n. 785.

The court must exercise some discretion in determining the amount of pre-judgment interest to be awarded. Although it is not legally required to do so, the court has considered the average annual federal judgment interest rate as a fair measure of the value of money from August, 1981 to December 31, 1986. This average is about 8.5 per cent. Thus, the court will allow prejudgment interest at an 8.5 per cent annual rate, not compounded.

Mr. Denton's damages accrued over more than five years between 1981 and 1987. To recognize this, the court will compute prejudgment interest by applying the annual 8.5% rate to the total back pay damages of $52,766 for about half of the time from August, 1981 to January, 1987. Thus, interest at 8.5% will be awarded for two and three-quarter years. This amounts to interest of about 23%.

Twenty-three percent of $52,776 is $12,-138.48. Thus, the court awards prejudgment interest of $12,138.48.

### H. *Front Pay*

"Future damages should not be awarded unless reinstatment is impracticable or impossible; the district court then has discretion to award front pay." *Wildman,* 771 F.2d at 616. The First Circuit did not in *Wildman* delineate when the court should exercise its discretion to award front pay. The court did, however, refer to cases in other circuits which emphasize that front pay should be awarded where reinstatement is not a possibility and front pay is necessary to ensure that the "plaintiff is returned as nearly as possible to the economic situation s/he would have enjoyed but for the illegal discharge." *Id.* at 615. Although *Wildman* is an ADEA case, the First Circuit's holding relied on Title VII cases in other circuits, which suggests that the First Circuit would allow front pay in Title VII cases as well.

The First Circuit, and other courts, have emphasized that front pay does not lend itself to a *per se* rule. "Because future damages are often speculative, the district court, in exercising its discretion, should consider the circumstances of the case...." *Id.* at 616. If the plaintiff can be made whole without front pay, as was the case in *Wildman,* front pay is unnecessary. As the Supreme Court has said about Title VII damages in general, the court is not supposed "to catapult [the plaintiff] into a better position than [he] would have enjoyed in the absence of discrimination." *Ford Motor Co. v. EEOC,* 458 U.S. 219, at 234, 102 S.Ct. 3057, at 3067, 73 L.Ed.2d 721 (1982).

The court may also allow a limited amount of front pay. In *Kallir,* for example, the court awarded a year's front pay, because it found that within that time the plaintiff should have been able to secure employment at a salary commensurate with her skills. 420 F.Supp. at 927.

 This court has found that reinstatement is impracticable in this case. *Denton,* 650 F.Supp. at 1162. Thus, the court must decide whether front pay will further the purposes of the act by returning plaintiff to the economic situation he would have been in absent the illegal discrimination, or catapult him into a better position. The plaintiff in this case requests lifetime front pay. This court finds, however, that lifetime front pay would unjustly enrich him and therefore be inappropriate. *Kumar v. Board of Trustees,* 566 F.Supp. 1299 (D.Mass.1983), *rev'd on other grounds,* 774 F.2d 1 (1st Cir.1986). Moreover, the court concludes that even a limited amount of front pay in this case would be inappropriate.

**52**

In 1986, the last year for which records concerning the ice cream store have been provided, Denton's total earnings have been determined to be $21,822. This figure indicates that Denton made substantially more than the average boilermaker in the appropriate comparison group. Moreover, in 1985, Denton earned even more. Thus, the court finds that front pay is not appropriate since the plaintiff has transformed his ice cream store into a successful business and is likely to make more in the future than he would have if defendant had not discriminated against him.

## II. ATTORNEY'S FEES

### A. *The Generally Applicable Standards*

 Title VII authorizes the court to award the prevailing party, Mr. Denton, his reasonable attorney's fees as part of his costs. 42 U.S.C. § 2000e–5(k). The standards for an award of fees under Title VII are the same as those applicable to Civil Rights cases under 42 U.S.C. § 1988. *Hensley v. Eckerhart,* 461 U.S. 424, 433 n. 7, 103 S.Ct. 1933, 1939, n. 7, 76 L.Ed.2d 40 (1983); *Proctor v. Consolidated Freightways Corporation of Delaware,* 795 F.2d 1472, 1478 (9th Cir.1986).

A fundamental aim of the provisions authorizing a prevailing plaintiff to recover his reasonable attorney's fees "is to make it possible for those who cannot pay a lawyer for his time and effort to obtain competent counsel...." *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* — U.S. —, 107 S.Ct. 3078, 3086, 97 L.Ed.2d 585 (1987) ("*Pennsylvania II*"); *see Hensley,* 461 U.S. at 430 n. 4, 103 S.Ct. at 1938 n. 4; *Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 950 (1st Cir.1984).

 Whether an award shall issue is in the sound discretion of the district court. *Grendel's Den,* 749 F.2d at 950 (the Court of Appeals will defer to any thoughtful rationale and decision on an attorney's fee application developed by the trial court and will avoid extensive second guessing); *King v. Greenblatt,* 560 F.2d 1024, 1027 (1st Cir.1977), *cert. denied,* 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978); *John-son v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717 (5th Cir.1974). Nonetheless, the district court must provide a clear and concise explanation of its decision to award or not award fees. *Grendel's Den,* 749 F.2d at 950; *King,* 560 F.2d at 1027.

The First Circuit has adopted what is commonly referred to as the "Lodestar Method" to determine reasonable attorney's fees. Under this method, a court must make a finding as to the hourly rate that would reasonably compensate the attorney for his work. The court then determines the number of hours that were reasonably necessary to litigate the case. Next, the court multiplies these two numbers and arrives at a lodestar figure. There is a "strong presumption that the lodestar figure—the product of reasonable hours times a reasonable rate—represents a 'reasonable fee.'" *Pennsylvania v. Delaware Valley Citizens Council,* — U.S. ——, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986) ("*Pennsylvania I*"). The court, however, may adjust the reasonable fee upward in "rare" or "exceptional cases." *Id.; see also Blum v. Stenson,* 465 U.S. 886, 898–901, 104 S.Ct. 1541, 1548–50, 79 L.Ed.2d 891 (1984). In certain circumstances it may also be appropriate to adjust a lodestar downward. *Hensley,* 461 U.S. at 433, 103 S.Ct. at 1939; *Calhoun v. Acme Cleveland Corporation,* 801 F.2d 558, 560 (1st Cir.1986); *Grendel's Den,* 749 F.2d at 951.

### 1. *Reasonable Rate*

 Fee awards must be "'calculated according to the prevailing market rates in the relevant community', that is 'those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.'" *Grendel's Den,* 749 F.2d at 955 (quoting *Blum,* 465 U.S. at 895 & n. 11, 104 S.Ct. at 1547 & n. 11). In determining a reasonable hourly rate, the court should look at the type of work performed, who did it, the expertise required, and when it was undertaken. *Id.* The party seeking fees may introduce evidence of the prevailing market rates in the community. The court should also consider the customary rates of the attorney seek-

ing fees, *Wojtkowski v. Cade,* 725 F.2d 127, 131 n. 1 (1st Cir.1984), as well as fees awarded in similar cases. *Johnson,* 488 F.2d at 719. A judge need not, however, accept an attorney's valuation of his own time. *Chrapliwy v. Uniroyal, Inc.,* 670 F.2d 760, 767 (7th Cir.1982) *cert. denied,* 461 U.S. 956, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983). Rather, the court may exercise some discretion in lowering such rates. *Id.*

█ The court also has the discretion to award different hourly rates for different types of work, *Wojtkowski,* 725 F.2d at 131; *Miles v. Sampson,* 675 F.2d 5, 9 (1st Cir.1982), and for work done at different stages of the case. *Grendel's Den,* 749 F.2d at 955.

#### 2. *Reasonableness of Hours*

In determining the amount of time reasonably necessary for a given case, the court begins with the actual hours reportedly spent on each task and deducts any hours that appear to be excessive or duplicative. *Grendel's Den,* 749 F.2d at 950. If an inordinate amount of time is spent on a minor part of a case, the excessive time is not compensable. *Diver v. Goddard Memorial Hospital,* 783 F.2d 6 (1st Cir.1986).

█ In making this determination, the court may apply its own knowledge, experience, and expertise in deciding whether the amount of time spent was reasonable. *Wojtkowski,* 725 F.2d at 130; *King,* 560 F.2d at 1027; *Johnson,* 488 F.2d at 717. The court may also consider the novelty and complexity of the case in determining the appropriate number of hours to include in the fee award. *Blum,* 465 U.S. at 898, 104 S.Ct. at 1548; *Johnson,* 488 F.2d at 718.

█ The party seeking fees has a duty to submit detailed and contemporaneous time records to document the hours spent on the case. A simple, after-the-fact tally is not sufficient. Copies of the actual time records should be submitted. *Calhoun,* 801 F.2d at 560. *Grendel's Den,* 749 F.2d at 952; *Wojtkowski,* 725 F.2d at 130–31; *Miles,* 675 F.2d at 8; *Nadeau v. Helgemoe,* 581 F.2d 275, 279 (1st Cir.1978).

█ "Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary." *Hensley,* 461 U.S. at 434, 103 S.Ct. at 1939; *see also Wagenmann v. Adams,* 829 F.2d 196, 224 (1st Cir.1987). If the party seeking fees has prevailed on only some of his claims, the time records that he submits should distinguish between time spent on successful and unsuccessful claims, if possible. *Hensley,* 461 U.S. at 434, 103 S.Ct. at 1939.

#### 3. *Downward Adjustment to the Lodestar Fee*

█ The failure to provide adequate documentation for a fee request may justify a drastically reduced award. *Calhoun,* 801 F.2d at 560. *Hensley,* 461 U.S. at 433, 103 S.Ct. at 1939; *Grendel's Den,* 749 F.2d at 952; *Souza v. Southworth,* 564 F.2d 609, 612 (1st Cir.1977). A reduction may also be appropriate if it is clear that the attorney seeking fees has failed to exercise normal "billing judgment" in his application. That is, the attorney should take the same care in his application to discount his fees for inappropiate hours as he would if he were billing his regular clients. *Hensley,* 461 U.S. at 434, 103 S.Ct. at 1939.

#### 4. *Upward Adjustments to the Lodestar Fee*

█ The Supreme Court has recently reiterated that an upward adjustment of a lodestar figure would be appropriate only in certain "rare" and "exceptional" cases. *Pennsylvania I,* 106 S.Ct. at 3098. The superior quality of an attorney's performance does not justify an enhanced fee:

> Because considerations concerning the quality of a prevailing party's counsel's representation normally are reflected in the reasonable hourly rate, the overall quality of performance ordinarily should not be used to adjust the lodestar ... removing any danger of 'double counting.'

*Id.* at 3099; *see also Hall v. Ochs,* 817 F.2d 920, 929 (1st Cir.1987). Similarly, the complexity of a case does not justify an upward

adjustment because it is already reflected in the lodestar's calculation of the number of hours reasonably spent by prevailing counsel. *Pennsylvania I*, 106 S.Ct. at 3098. Nor does the contingent nature of an attorney's fee ordinarily justify an enhancement of the lodestar. *Pennsylvania II*, 107 S.Ct. at 3086.

### 5. *Prevailing Party*

A plaintiff is the prevailing party for the purposes of an award of attorney's fees if he has succeeded on any significant issue in litigation which achieves some benefit that he sought in bringing the suit. *Nadeau*, 581 F.2d at 278–79.

The Supreme Court has stated the standards for awarding fees in cases in which a party has prevailed in some but not all of his claims. In *Hensley*, the Court distinguished between cases in which a plaintiff has brought several unrelated claims against a defendant and a case in which plaintiff has brought several claims based on different legal theories but all arising out of the same nucleus of facts. In the case of unrelated claims, the party seeking fees may only recover for work done on the successful claims. On the other hand, in a case involving related legal claims arising from the same basic set of facts:

> Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.
>
> Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified. In these circumstances, the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit.... Litigants in

good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of a failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters.

> If, on the other hand, a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith. Congress has not authorized a lawsuit whenever it was reasonable for a plaintiff to bring a lawsuit or whenever conscientious counsel tried the case with devotion and skill. Again, the most critical factor is the degree of success obtained.

*Hensley*, 461 U.S. at 435–36, 103 S.Ct. at 1940–41. In short, a party that has prevailed on some but not all of its related claims and has received substantially complete relief should be treated the same as a party that prevailed on all of its claims and received full relief. However, "where the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained." *Id.* at 440, 103 S.Ct. at 1943. Furthermore, "[a] reduced fee award is appropriate if the relief, however significant, is limited in comparison to the scope of the litigation as a whole," or the plaintiff's unsuccessful claims are "distinct in all respects" from his successful claims. *Id.*

The Court of Appeals for the First Circuit has recently interpreted *Hensley*, stating:

> [W]hen a civil rights suit consists of multiple claims, and when the plaintiff prevails on some of them but not on others, the plaintiff is entitled to fees worked not only on the successful civil rights claims, but also on other claims involving a "common core of facts."

*Aubin v. Fudala*, 782 F.2d 287, 291 (1st Cir.1986).

## B. *Application of the Standards*

An award of attorney's fees is appropriate in this case in order to compensate Mr. Denton's counsel for their willingness to represent him and for their efforts on his behalf, as well as to encourage other attorneys to represent plaintiffs in Title VII matters where the prospect of payment is uncertain.

Plaintiff's counsel are Paul Nevins and Phillip Olenick. Mr. Nevins requests compensation for 323 hours at the rate of $125 per hour. Mr. Olenick requests payment for 317 hours at the rate of $125 per hour.

Although this case initially involved numerous legal theories based on federal and state laws, they all were based on a common nucleus of facts. In prevailing on his Title VII claim, Mr. Denton achieved all of the relief he was seeking on various theories. Thus, plaintiff is the prevailing party and may recover *reasonable* compensation for all of the work *reasonably* done on his related claims.

However, as described below, counsel's submissions concerning attorney's fees were deficient in several respects; the rates at which counsel seek compensation are excessive; considerable redundant effort was expended on appropriate claims; an inordinate amount of time was spent on minor, unmeritorious aspects of the case; unnecessary time was spent in litigating against the defendant International Brotherhood of Boilermakers (the "International"), which plaintiff eventually agreed to dismiss from the case; and this is not one of the rare instances in which a properly calculated lodestar should be increased in computing reasonable attorney's fees. Thus, the amount of the reasonable attorney's fees awarded is less than the amount requested.

### 1. *Rates*

Mr. Denton's attorneys, Paul Nevins and Phillip Olenick are sole practioners who share office space. Each seeks compensation at the rate of $125 per hour.

Despite being given several opportunities to do so, plaintiff's counsel provided no evidence of the prevailing rate in the community for similar services being rendered by lawyers of comparable quality. Rather, they ask that the court take judicial notice that major law firms typically charge $125 to $175 per hour to defend claims of employment discrimination. This is not, however, a matter of which the court can or will take judicial notice. The only evidence on this issue is presented by the affidavit of defendant's counsel, Paul Kelly. Mr. Kelly, who has considerably more experience and expertise in labor matters than either Mr. Nevins or Mr. Olenick, charged the defendant Local 29 $85 per hour for his initial efforts and $95 per hour in the latest stages of the litigation.

Mr. Nevins and Mr. Olenick each filed affidavits addressing their legal experience and some of their billing practices. Mr. Nevins has been an attorney since 1982. He has a general practice. Much of it involves appointments in criminal cases in state court for which he is paid $25 to $35 per hour. He also handles some probate matters for which he charges $125 per hour. During the pendency of the Denton case, Mr. Nevins handled 26 civil cases on an hourly basis. Four clients retained him at $125 per hour. The balance retained him at $50 to $100 per hour. Mr. Nevins says he has settled three Title VII and age discrimination cases, but does not disclose the compensation he received in those matters.

Mr. Olenick has been an attorney since 1977. He has also accepted many appointments in criminal cases for which he was paid $25 to $35 per hour. During the pendency of this case Mr. Olenick was also involved in 14 civil litigation matters, at hourly rates ranging from $50 to $125. Mr. Olenick says that he has settled one Title VII case, but he too does not disclose the compensation he received.

Based upon the evidence presented and the court's knowledge and experience, the court concludes that $75 per hour is a reasonable rate for Mr. Nevins and for Mr. Olenick.

## 2. *Hours*

Mr. Nevins seeks compensation for 323 hours of work on this case. Mr. Olenick seeks to be paid for 317 hours. Each of these requests is excessive.

Mr. Olenick maintains contemporaneous records of how his time was spent on a computer and has furnished a computerized summary of the relevant information. The summary, however, is deficient in the level of detail presented. Mr. Nevins' time is similarly summarized and similarly deficient. It is not clear, however, that his records are on Mr. Olenick's computer; rather, his submission does not appear to consist of the requested and required contemporaneous records.

More importantly, Mr. Nevins and Mr. Olenick chose to handle this case in tandem when one able and experienced attorney would have been adequate to the task, particularly if supported by a less expensive attorney to assist with legal research. This approach involved certain inefficient divisions of labor. It also involved some unnecessary duplication of effort. Counsel have not reduced their fee request to reflect this redundancy. Rather, they seek compensation for every hour spent by each. The court doubts they would exercise their usual billing judgment to charge a typical client for all of their time spent on the case. In any event, it is unreasonable for them to seek compensation for their unnecessary duplication of effort.

In addition, counsel unreasonably expended considerable time on unnecessary claims. For example, plaintiff initially sued the International, of which Local 29 is a member, as well as Local 29. Counsel spent at least 55 hours in discovery disputes with the International and in preparing to respond to the International's motion for summary judgment before stipulating to the dismissal of the claim against the International. The desire for discovery from the International neither required nor justified this level of effort. Plaintiff also improperly sued Fred Hayes, an official of Local 29, and unnecessarily devoted time to the claim against him before it was dismissed.

Similarly, in addition to his Title VII claim, plaintiff also alleged that Local 29 committed unfair labor practices prohibited by § 8(b)(1) of the National Labor Relations Act and violated various state law claims. It appears that considerable time was spent by counsel in preparing and defending such minor, collateral claims against defendants' motion for summary judgment; the inadequate detail in the descriptions of the work done does not permit the court to determine precisely how much time was so spent. As explained in this court's January 28, 1986 Memorandum and Order, however, the National Labor Relations Act and state law claims were without merit. *Denton*, 653 F.Supp. 55 (D.Mass.1986). Much of the time spent on them was unreasonable.

Counsel also spent an excessive amount of time on other matters. For example, 10 hours were spent by Mr. Olenick on researching the case law concerning objections to interrogatories. Mr. Nevins later spent 6 hours researching similar issues. The fundamentals of such objections should be known to capable counsel. The level and duplication of effort in this area was excessive.

Finally, although only Mr. Nevins tried the case, Mr. Olenick was present part of the time. Some of his time in court was unnecessary.

The court finds that the 13 hours spent by Mr. Nevins and the 23 hours spent by Mr. Olenick on post trial matters, including issues relating to the award of damages and attorney's fees, was reasonable. In view of the previously described defects, however, the 310 hours and 295 hours for which Mr. Nevins and Mr. Olenick seek compensation through trial are excessive. Rather, after reviewing the hourly summaries provided by counsel and making appropriate reductions, the court concludes that it would be reasonable to compensate Mr. Nevins for a total of 243 hours and Mr. Olenick for a total of 208 hours.

The court notes that defendant's counsel, Mr. Kelly, offered evidence that defendant Local 29 was billed for 282 hours work in this case. Plaintiff's counsel are being

awarded compensation for considerably more hours. This difference is explained in part by defense counsel's greater experience and expertise, reflected in his higher hourly rate, and in part by counsels' differing roles in prosecuting and defending the action.

### 3. *Further Adjustments*

 This is not a rare or exceptional case justifying an increase to the lodestar, particularly when it is recognized that the contingent nature of the representation is not usually a factor to be applied to increase the amount of fees deemed reasonable. *Pennsylvania II*, 107 S.Ct. at 3086. Mr. Denton's counsel were loyal and energetic, but the court believes the hours and rates deemed reasonable are already on the generous end of the reasonable range for their performance in this case.

### 4. *Conclusion*

Accordingly, Mr. Nevins shall be awarded compensation for 243 hours at $75 per hour, a total of $18,225. Mr. Olenick shall be awarded payment for 208 hours at $75 per hour, a total of $15,600.

## III. ORDER

For the reasons previously stated, it is hereby ORDERED that judgment enter for plaintiff Horace Denton and that defendant Boilermaker's Local 29 pay plaintiff:

1. Backpay in the amount of $52,776.78;
2. Prejudgment interest of $12,138.48;
3. Reasonable attorney's fees for Paul Nevins in the amount of $18,225, and for Phillip Olenick in the amount of $15,600; and
4. The costs of this action.